Donald Keith NEWBURY, Appellant,

v.

The STATE of Texas.

No. 74308.

Court of Criminal Appeals of Texas.

April 21, 2004.

Douglas H. Parks, Dallas, for Appellant.

Michael J. Sandlin, Assistant District Attorney, Dallas, Matthew Paul, State's Attorney, Austin, for State.

## *OPINION*

HERVEY, J., delivered the opinion of the Court in which KELLER, PJ., MEYERS, PRICE, JOHNSON, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

A jury convicted appellant of capital murder. The trial court sentenced appel-

lant to death pursuant to the jury's answers to the special issues submitted at the punishment phase. Appellant raises twenty-three points of error in an automatic direct appeal to this Court. We affirm.

Appellant does not challenge the sufficiency of the evidence to support the jury's guilty verdict or the jury's answers to the special issues. The evidence shows that appellant and others (the "Texas 7") escaped from prison. They later murdered a Dallas police officer in a volley of gunfire during a robbery on Christmas Eve.

■ In point of error one, appellant claims that, during voir dire, the trial court violated Article 35.16(a)(10), TEX.CODE. CRIM. PROC., and Article 35.17, § 2, TEX. CODE.CRIM. PROC., "by failing to inquire as to whether prospective jurors had already formed an opinion as to appellant's guilt that would influence their actions in rendering a verdict in the case." In point of error two, appellant claims that this also violated the Sixth and Fourteenth Amendments to the United States Constitution by directly affecting "the determination of whether impartial jurors are impaneled." Article 35.17, § 2, provides:

> In a capital felony case in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

Article 35.16(a)(10) provides that a veniremember is subject to a challenge for cause when the following conditions are met:

> That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. **To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court.** If he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay, and if the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case. If the court, in its discretion, is not satisfied that he is impartial, the juror shall be discharged.

(Emphasis added).

The record reflects that the trial court submitted the following as part of the juror questionnaire form.

> Although neither side is permitted to tell you their version of the facts in this case, both sides have agreed to summarize the allegations as follows, to see if you know anything about this case:

> It is alleged that on December 24, 2000, Irving police officer Aubrey Hawkins was shot to death outside of an Oshman's Sporting Goods Store.

> There has been news media coverage regarding this case. If chosen as a ju-

ror you will have taken an oath that requires you to return a verdict, whatever that verdict is, on the basis of the evidence that you hear in the courtroom and not from some outside source. Therefore, there is nothing wrong with a prospective juror, such as yourself, having heard of this case, or having heard of this defendant. However, it is not permissible if what you have heard causes you to have a preconceived conclusive opinion that the defendant is guilty or not guilty, or a preconceived conclusive opinion as to what punishment the defendant should receive, if found guilty. A juror is not qualified to serve if there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the jurors action(s) in reaching a verdict.

All defendants are presumed to be innocent. This presumption requires the State to prove a defendant's guilt beyond a reasonable doubt before a jury would be authorized in finding the defendant guilty of an offense. Only evidence presented in court, under oath, and subject to cross examination is to be considered by a jury in determining whether the State has satisfied its burden of proof in a particular case. A juror, to be qualified, must set aside any opinion held concerning a defendant's guilt that was formed by the reading of newspaper accounts, by seeing or hearing other media reports, or through rumor or hearsay.

The record also reflects that appellant filed a written motion to delete this language from the juror questionnaire form and to submit, among other things, the following:

It is alleged that, on or about December 24, 2000, the Defendant, Donald Keith Newbury, killed Aubrey Hawkins, an Irving Police Officer, at an Oshman's Sporting Goods Store, during the course of a robbery, by shooting him with a firearm. These allegations have been reported by the media.

. . .

Based upon anything you have heard or read, have you formed an opinion of the guilt or innocence of the Defendant which would influence your verdict? —— Yes —— No.

Appellant's written motion, in relevant part, asserted the following reasons for submitting his requested language in the juror questionnaire:

In an effort to "qualify" those jurors who would be disqualified under [Article 35.16(a)(10) ], the language of the questionnaire misstates the law by instructing the prospective jurors that one is disqualified only if one has "a preconceived conclusive opinion that the defendant is guilty or not guilty or a preconceived conclusive opinion as to what punishment the defendant should receive, if found guilty."

Furthermore, Defendant objects to the attempt to instruct the prospective jurors what they must say if they wish to serve on the jury, even if they have reached an opinion which would influence their verdict.

The record further reflects that the trial court denied this motion just after appellant pled to the indictment and prior to the beginning of the voir dire of the jury panels.

[THE COURT]: Mr. Parks, what is your client's plea to that indictment?

[APPELLANT]: Not guilty, Your Honor.

[THE COURT]: Thank you. You may be seated.

Mr. Parks, let me ask you, are there further motions that need to be handled at this time?

[APPELLANT]: Uh, the only other motion that needs to be handled at this time, Your Honor, would be the motion that I have filed objecting to the language regarding publicity in the questionnaire.

Uh, that has been discussed, I believe Mr. Shook conferring with Judge Francis prior to the time she left the bench. We have not had a hearing on that motion. However, she did indicate both to myself and Mr. Shook that she intended to deny that motion. It just needs to be put on the record.

I am not sure if you have the motions there. It would be—those motions are categorized by subject. It is going to be one of the motions dealing with voir dire. And it will be a motion objecting to language in the questionnaire. I can't remember exactly how I titled it.

[THE COURT]: Would be that the motion to substitute language in the questionnaire?

[APPELLANT]: Yes, ma'am.

[THE COURT]: All right. That objection is denied.

This Court has held that a trial court does not violate Article 35.17, § 2, under circumstances almost identical to those presented here. *See Freeman v. State,* 556 S.W.2d 287, 294 (Tex.Cr.App.1977), cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978).[1] In *Freeman,* this Court decided that the trial court did not err to refuse the defendant's requested instruction like the one here where, among other things, the record reflected "that the judge gave extensive instructions to the jury panel" on "matters of reasonable doubt, burden of proof, return of indict-ment by grand jury, presumption of innocence, and prejudice and opinion" and thereafter "the State and [the defendant] were given the opportunity ... to examine each member of the panel on voir dire individually and apart from the entire panel." *See id.*

■ And, assuming that appellant preserved the constitutional claim that he raises in point of error two, appellant provides no United States Supreme Court authority, and we are aware of none, holding that the United States Constitution requires the submission of appellant's requested language in the juror questionnaire form. We are unpersuaded that this record presents a colorable claim of any constitutional violation, particularly since appellant had the opportunity to examine each veniremember individually during voir dire on the issue of whether that veniremember had formed an opinion of appellant's guilt which would influence the veniremember's verdict. *Cf. Freeman,* 556 S.W.2d at 294.

■ Appellant also claims in these points that during individual voir dire the veniremembers should have been asked only whether they had formed any conclusions that would influence their verdict. Appellant argues that it not only violated Article 35.16(a)(10) to accurately explain the law to the veniremembers in the juror questionnaire form but it also violated Article 35.16(a)(10) to permit the prosecution to repeat this in its prefatory remarks during voir dire, before asking the veniremembers whether they had formed any conclusions that would influence their verdict. Appellant seems to claim that this effectively permitted the prosecution to rehabilitate veniremembers who might have already been challengeable for cause under Article 35.16(a)(10) "without further inter-

---

1. *Freeman* was overruled on other grounds.

rogation by either party." Appellant argues that having "potential jurors who may have already formed opinions as to Appellant's guilt, and who should therefore have been excused without further questioning by either side or the court, violated [Article 35.16(a)(10) ] and denied Appellant due process of law."

Our review of the record indicates that appellant first raised this particular claim on the second day of individual voir dire. The objected-to language in the juror questionnaire had already been submitted to all of the veniremembers and three veniremembers had already been individually questioned. Two of these veniremembers were excused by agreement of the parties and appellant exercised a peremptory challenge on the third one. Appellant made the following complaint at this time:

[APPELLANT]: Your Honor, if it please the Court. Based upon the review of the questionnaires, almost without exception, the prospective jurors in this case have indicated on the questionnaire on Page 3 that they have heard about this case. And many of them have indicated they have heard about it by radio, TV, word of mouth, different ways.

At this time, the defense respectfully requests the Court prior to any interrogation conducted by either the State or the defense, to make inquiry of each potential juror pursuant to Article 35.16, Section 10, to determine whether or not the prospective juror has formed an opinion which could affect his verdict in the case. I respectfully request the Court to follow the admonitions in Section 10 that if that person says yes, that he or she be discharged without any further interrogation after that.

If that person answers no, that the Court make inquiry as stated in that section to determine what that person has heard, where they have heard it and what effect it will have on their verdict, if any. Then in the Court's discretion, make a determination whether or not that person is qualified to serve. We would ask that that be done before any interrogation is made because the purpose of the statute is to not allow rehabilitation where a person has formed an opinion that would affect his or her judgment and to not make that inquiry before the State has an opportunity to rehabilitate, as it were, or wires around that statute. And we would ask the Court to take that action.

[TRIAL COURT]: Thank you, Mr. Parks. Mr. Shook.

[PROSECUTION]: Judge, we would object to that motion. We feel that voir dire should proceed as it does in every case, and that is an issue we can talk to the jurors about.

[APPELLANT]: May I respond to that?

[THE COURT]: Certainly.

[APPELLANT]: We are not proceeding as we do in every case. An exception has been made in the Rivas trial, an exception has been made in this trial. We requested the statutory language be placed in the questionnaire that was denied. In a very, very recent high profile case, Timothy Richardson, that statutory language was put in the questionnaire. This is the exception, not the rule.

And the whole purpose of doing it this way is to see if we can't get a jury that has already made up their mind about this case or a fear that it will be difficult and inconvenient to seat a jury in this case if we allow the defendant to have the benefit of the statute.

Venue has been changed in this county many times to address just this issue.

We haven't moved for a change of venue. We believe at present, at least, that a fair and impartial jury can be seated in Dallas County, but only if the defendant is given the benefit of the statute that the legislature has set out in these instances. This is not how it is always done. This is not—this is an exception to that.

Frankly, in my experience trying over 12 death penalty cases, we wouldn't have even talked to that guy yesterday except in this case.

[TRIAL COURT]: Talking about Mr. John?

[APPELLANT]: Mr. John.

[TRIAL COURT]: Mr. Shook?

[PROSECUTION]: Judge, my response would be I have done other cases where it has been in the media a lot and we have asked the jurors if they heard of this and the judge has not proceeded ahead by going over the statutory language. We simply voir dire like we do in other cases. I would disagree with Mr. Parks. We could go back and forth on that, but—

[THE COURT]: Okay. Motion will be denied. Ready for [another veniremember]?

Assuming that appellant preserved this specific complaint for appellate review, we decide that the prosecutor's prefatory remarks during individual voir dire accurately explaining the law to the veniremembers did not violate the procedures set out in Article 35.16(a)(10). Article 35.17, § 2, literally permits this information to be conveyed to the veniremembers. *See id.* (requiring the trial court to propound questions "concerning the principles, as applicable to the case on trial" of, among other things, "opinion"); *Freeman,* 556 S.W.2d at 294. And, Article 35.16(a)(10) does not literally prohibit it. Appellant does not point to anywhere in the record where the prosecution was permitted to rehabilitate veniremembers who stated that they had formed a conclusion about appellant's guilt that would influence their verdict.

We further note that in 1965 the Legislature added the "without further interrogation by either party" language to Article 35.16(a)(10). *See* Acts 1965, 59th Leg., ch. 722, § 1, effective January 1, 1966. According to Former Presiding Judge Onion's Special Commentary, this language was added (not out of a concern that permitting rehabilitation would affect "the determination of whether impartial jurors are impaneled") but because the practice under prior law resulted "in attempts of counsel and the court to qualify a prospective juror who had made such statement which consumed a great deal of time with little success." This language was not meant to prohibit a party from accurately explaining the law to the veniremembers. Points of error one and two are overruled.

In points of error three through fourteen, appellant claims that the trial court erroneously denied his challenges for cause to twelve veniremembers. The State claims that appellant failed to preserve any error with respect to two of these veniremembers and that he has failed to show harm with respect to the other ten veniremembers because none of them served on appellant's jury, which was fair and impartial. It is, however, irrelevant that appellant's jury was fair and impartial in determining whether he was harmed by the erroneous denial of a defense challenge for cause. *See Johnson v. State,* 43 S.W.3d 1, 6 (Tex.Cr.App.2001) and at 12–13 (Hervey, J., dissenting).

Instead, harm from the erroneous denial of a defense challenge for cause focuses on whether a peremptory challenge "was wrongfully taken from [the de-

fendant]." *See Johnson,* 43 S.W.3d at 6; *Wolfe v. State,* 147 Tex.Crim. 62, 178 S.W.2d 274, 280–81 (1944). Harm from the erroneous denial of a defense challenge, therefore, occurs: (1) when a defendant exercises a peremptory challenge on a veniremember whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use on another veniremember whom the defendant identifies as "objectionable" and who actually sits on the jury. *See Johnson,* 43 S.W.3d at 5–6.

■ When these conditions are met, we have stated that this harms a defendant because he had to use a peremptory challenge to remove a veniremember who should have been removed for cause which, in effect, wrongfully deprives the defendant of one of his statutory peremptory challenges. *See Johnson,* 43 S.W.3d at 6 and at 12 (Hervey, J., dissenting). When these conditions are met and a defendant has been granted an additional peremptory challenge, he must show that two of his challenges for cause were erroneously denied in order to show that he was wrongfully "deprived" of "the use of at least one of his allotted peremptory challenges." *See Martinez v. State,* 763 S.W.2d 413, 415 (Tex.Cr.App.1988).

The record in this case reflects that appellant used peremptory challenges to remove nine of the veniremembers after the trial court had denied appellant's challenges for cause to them: John (point three), Bowen (point four), McComb (point five), Griffin (point six), Dickson (point seven), Miller (point eight), Carter (point nine), Roberge (point eleven) and Rupert (point thirteen). The record further reflects that appellant had peremptory challenges remaining when he did not use a peremptory challenge to remove Taylor (point ten) and Francis (point twelve) after the trial court had denied his challenges for cause to them. The record also reflects that appellant had used all of his peremptory challenges when the trial court denied his challenge for cause to Albrecht (point fourteen). The trial court, however, granted appellant's request for an additional peremptory challenge which appellant used to remove Albrecht.

When the trial court later denied appellant's challenge for cause to another veniremember (Modic), appellant claimed that Modic and six others "who are on the jury or potentially will be on the jury" were "unacceptable to the defense." The trial court denied appellant's request for an additional peremptory challenge to remove Modic, who sat as a juror on appellant's case.

[APPELLANT]: Your Honor, for all of the reasons just stated into the record, we would advise the Court that Mr. Modic is not a juror acceptable to the defense and would certainly identify him as such.

And further, we would identify the following jurors as persons who have previously been placed on the jury who were submitted for cause by the defense and who are each and every one unacceptable jurors to the defense.

Juror Number 1, Charles Crump, for the reasons stated in the record at the time he was interviewed. Juror Number 3, Lorenzo Castillo, again for the reasons stated in the record. Juror Number 4, Shirley Taylor, for the reasons previously stated into the record. Juror Number 5, Donna Stroud, for the reasons previously stated into the record. Juror Number 7, Rex Francis, for the reasons previously stated into the record. Juror Number 9, Steven

McNeeley, for the reasons previously stated into the record.[2]

So there are a total of, including Mr. Modic, six—seven jurors who are on the jury or potentially will be on the jury who are unacceptable to the defense. And for that reason, since we already have six, we would respectfully request the Court to grant defense an additional peremptory strike so that Mr. Modic will not become number seven.

[TRIAL COURT]: It will be denied. Anything further?

[APPELLANT]: No, sir.

[8] Because appellant could have but did not use peremptory challenges to remove Taylor (point ten) and Francis (point twelve), appellant has failed to show any harm from any error in the trial court's denial of appellant's challenges for cause to these two veniremembers. *See Johnson,* 43 S.W.3d at 5 (defendant must show, among other things, that he used a peremptory challenge to remove veniremember whom he claims should have been removed for cause) and at 5 n. 6 (discussing past confusion of "preservation of error and harm issues within the context of an erroneous denial of a challenge for cause"). The record otherwise reflects that appellant satisfied the conditions for showing harm from any error in the trial court's denial of appellant's challenges for cause to the other ten veniremembers except that appellant must show that at least two (instead of one) of these veniremembers should have been removed for cause since appellant received an additional peremptory challenge. *See Martinez,* 763 S.W.2d at 415.

We review a trial court's ruling on a challenge for cause with "considerable deference" because the trial court is in the best position to evaluate the veniremember's demeanor and responses. *See Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Cr.App.1998); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Cr.App.1997) (appellate courts afford "almost total deference" to a trial court's resolution of factual and legal issues that turn on an evaluation of credibility and demeanor). We will reverse a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *See id.*

Appellant claims that the trial court should have granted his challenge for cause to John (point three) because John had formed an opinion about appellant's guilt "that would affect his ability to be a fair and impartial juror" and because John would not afford appellant the presumption of innocence. Appellant relies on the following portion of the voir dire record where John testified that he would "absolutely" require appellant to present some evidence that appellant was not involved in the offense.

Q. [APPELLANT]: No, sir, he is not. But, you know, one of those things kind of goes along with another. In addition to the presumption of innocence, Mr. John, the State is also required to carry the burden of proof, and that means that they have to come forward and prove their case beyond a reasonable doubt, if they can. And the burden of proof never shifts to the defense.

Let me put it to you this way. Do you believe that would—it would take some

---

**2.** Assuming that a defendant can retroactively identify "objectionable" jurors, the record nevertheless reflects that appellant did not request additional peremptory challenges to remove any of these six jurors. *Cf. Rocha v. State,* 16 S.W.3d 1, 5–6 (Tex.Cr.App.2000) (tri-
al court does not err in failing to grant capital defendant an out-of-time peremptory challenge). The record further reflects that appellant could have but did not use a peremptory challenge to remove at least one of them (Francis, point of error twelve).

evidence brought to you by the defense to show you that [appellant] was not involved in this killing or was not involved in any of this before you could return a verdict of not guilty?

A. [VENIREMEMBER]: Absolutely, yes.

The record, however, reflects that John also testified that he would not shift the burden of proof to appellant.

Q. [PROSECUTION]: Okay. The State has the burden of proof. We have to prove the case beyond a reasonable doubt. And that burden of proof never shifts to the defense. Okay? It always stays here. Now, after we put on five or 10 witnesses, does it shift over to the defense where they have the burden of proof. The burden of proof always stays on the State. The defense, they're very good attorneys, but they are under no obligation to prove anything to you. Their only obligation really is to show up here at court. They don't have to ask questions. They could sit there and work crossword puzzles if they want. They're not going to do that, but they're not under any obligation. They're obviously going to do a very good job. But we give that example to illustrate the point that that burden never shifts to them. Could you require the State to prove its case beyond a reasonable doubt and not shift that burden of proof over to the defense if you sat as a juror?

A. [VENIREMEMBER]: Yes.

The record further reflects that John also testified that he had not established an opinion as to appellant's guilt "that would affect [his] ability to serve and to return a verdict in this case."

Q. [APPELLANT]: Do you think, Mr. John, in all honesty, based upon what you have read and heard and these opinions that you have formed, that you have had established in your mind an opinion

as to the guilt or innocence of the defendant that would affect your ability to serve and to return a verdict in this case?

A. [VENIREMEMBER]: No.

On this record, the trial court could have reasonably concluded that "no evidence [was] adduced" from John that any opinions he may have formed about appellant's guilt would influence his verdict. *See Curry v. State*, 910 S.W.2d 490, 493 (Tex.Cr. App.1995) (no error to deny defense challenge for cause based on veniremember's conclusion about the defendant's guilt where no evidence was adduced from the veniremember "that his conclusions would have affected his verdict"). And, even if such evidence was adduced, John provided other testimony that any opinions he may have formed about appellant's guilt would not influence his verdict. In addition, we cannot conclude that the trial court clearly abused its discretion to deny appellant's challenge for cause to John based on his conflicting answers about shifting the burden of proof to the defense. *See Colburn*, 966 S.W.2d at 517 (appellate courts should not second-guess trial court's ruling on challenge for cause where veniremember's responses are "vacillating, unclear, or contradictory"). The trial court was in the best position to evaluate John's demeanor and responses. *See id.*

■ Appellant claims that the trial court should have granted his challenge for cause to Bowen (point four) because she had formed an opinion about appellant's guilt on the robbery element of the offense which would "would affect her actions in finding a verdict." Appellant relies on the following portion of the voir dire record.

Q. [APPELLANT]: Okay. And correct me if I am wrong, I am not trying to put words into your mouth. There is no

question, I think, from what you have told us, that [appellant] was involved in a robbery of Oshman's. It is the issue of how and who caused the officer's death, that is where you would place the burden of proof on the State?

A. [VENIREMEMBER]: Yes.

Q. Okay. And you understand that one of the things—and I'm not trying to split hairs with you, Ms. Bowen, but one of the things that the State has got to prove that the State—that the law places the burden on them is to prove [appellant] was involved in a robbery. And you already believe that. That is not an issue for you. Is that pretty much the truth of the matter?

A. Yes, uh-huh.

The record, however, reflects that Bowen also testified that her verdict would not be influenced by anything that she heard in the media about the case.

Q. [PROSECUTION]: The law says that just because you have heard about a case or you may know some things that you have read in the media, whether it be reading the newspaper or seeing it on TV or even getting on the internet and talking with your friends, whatever, the law says that that does not disqualify you as a juror just because you know something about it. As long as you are not going to let that influence your verdict in the case, you're eligible to sit as a juror.

Where do you fit? Are you the type of person that even though you may have some facts or alleged facts you may have heard about it, read about it, can you set that aside and base your verdict solely on the evidence you hear in the courtroom and not let that influence you in any way?

A. [VENIREMEMBER]: Yes, I think I could.

Q. Okay. Now, I'm not picking on you, I promise, but every time—normal conversation, you're out somewhere, everybody says, I think I can do that or I believe I can do that. In here, for the record, we have to have solid yes's or no's. So let me ask you again. If you were asked to be a juror in this case, could you reach a verdict in this case based solely on the evidence you hear in this courtroom and the law the judge gives you and not be influenced by any type of media reports you may have heard prior to the trial?

A. Yes, uh-huh.

The record also reflects that the trial court denied appellant's challenge for cause to Bowen because Bowen never stated that any conclusion that she had formed about appellant's guilt on the robbery element would influence her verdict.

[APPELLANT]: . . .

Finally, although the exact words of the statute we can never get around, it is obvious that the juror absolutely believes that [appellant] is guilty of the offense of robbery, that he is one of the seven who escaped from the penitentiary. The only thing the State is going to have to prove to her is how the officer was killed and who did it, whatever that means. And certainly part of the State's case is that they must prove a killing in the course of a robbery, and this juror has already decided that part of it.

And we would respectfully suggest that under the provisions of Article 35.16(10) that this is a person whose conclusions as to the guilt or innocence of the defendant would affect her actions in finding a verdict in this case and she ought to be excused.

[THE COURT]: And response from the State?

[PROSECUTION]: Yes, Judge . . . .

With regards to their third challenge, specifically relying on *Currey [sic] v. State,* the venireperson's admission—and this is the language—the venireperson's admission that they already had some picture of guilt that had been created during voir dire is not enough to sustain a challenge absent testimony that the conclusion would, in fact, affect the venireperson's verdict. And that was never done. Never one time did she say it would affect how she reached a verdict in the case.

[THE COURT]: That is the way I recall her testimony. The challenge will be denied . . . .

[APPELLANT]: Did I just completely mishear what she was saying?

[THE COURT]: I doubt it. I mean, maybe I did. But I recall . . . and then you didn't complete Paragraph 10.

[APPELLANT]: Well, is it the Court's position that that Paragraph 10 has got to be done within the magic words of the statute.

[THE COURT]: Well, I think you have got to go ahead and ask if that is going to influence your verdict or finding the verdict guilty. I think you have to.

[APPELLANT]: The fact that she has already made up her mind he is guilty isn't sufficient to—

[THE COURT]: I think you have to ask that last phrase.

On this record, the trial court could have reasonably concluded that "no evidence [was] adduced" from Bowen that any opinions she may have formed about appellant's guilt would influence her verdict. *See Curry,* 910 S.W.2d at 493. And, even if such evidence was adduced, Bowen provided other testimony that she could reach a verdict based solely on the evidence that she heard at trial. We cannot conclude that the trial court clearly abused its discretion to deny appellant's challenge for cause to Bowen based on these conflicting answers. *See Colburn,* 966 S.W.2d at 517. The trial court was in the best position to evaluate Bowen's demeanor and responses. *See id.*

■■ Appellant claims that the trial court should have granted his challenge for cause to McComb (point five) because he had formed an opinion about appellant's guilt which would prevent him from being an impartial juror. Our review of the record indicates that McComb testified that any opinions that he had formed about the case would not influence his verdict. For example,

Q. [PROSECUTION]: The law contemplates, though, that you may have information about a case. You may even have formed some opinions about a case. As long as you can set those aside and not let those influence your verdict, you can be—you're eligible to be a juror on the case. Some people come in here, quite frankly, and tell us, look, whether I believe the media may misreport information or whatever, I have formed my opinions and that is just it, I won't be able to set those aside. That is fine. We just—those people aren't going to be jurors on the case.

But there are also people that say, yeah, I have heard about it, I formed opinions at the time. But if you're telling me the law says I've got to set that aside, I can do that. Where do you fit in?

A. [VENIREMEMBER]: The latter.

Q. You can set any of the opinions you have formed aside and not let those influence your verdict in any way?

A. Yes.

Appellant, however, contends that McComb's claim of impartiality was "an obvious attempt to qualify for the jury, in accordance with the education he received

at the hands of the trial court and prosecutor" which, according to appellant, "was a result of misstatements of law and a course of action intended to deprive this Appellant of a fair and impartial jury, all in the service of expediency." The trial court was in the best position to make this call. *See Colburn*, 966 S.W.2d at 517. In addition, appellant does not cite to any misstatements of law in the record and we have not found any either.

Appellant claims that the trial court should have granted his challenge for cause to Griffin (point six) because she had formed an opinion about appellant's guilt which would prevent her from being an impartial juror. Our review of the record, however, indicates that Griffin testified that she did not believe that any opinions that she had formed would affect her judgment. For example,

> Q. [PROSECUTION]: So with regards to this case and [appellant] here, are you telling both sides and the judge that any opinion you might have now, I guess, will not affect any judgment or decision that you have during the trial?
>
> A. [VENIREMEMBER]: I don't believe it would.

Griffin later testified, in response to defense questioning, that she would "listen to the law" and be "honest" and that she could "wipe aside [her] opinions."

> Q. [APPELLANT]: No, ma'am. Let me apologize if I'm offending you, but that is not what I'm trying to—
>
> A. [VENIREMEMBER]: But I already said that I would listen to the law and I am offended by you saying I wouldn't be honest because I am very honest.
>
> Q. I understand that.
>
> A. And I am very opinionated too. I am honest about that.

> Q. Okay. But you put yourself in my shoes.
>
> A. I wouldn't want to be there.
>
> Q. I understand that. I have an obligation, I have a responsibility.
>
> A. Okay.
>
> Q. And I have a person who has told me that they have an opinion with respect to my client's involvement in this offense.
>
> A. From what I have heard from the news, yes.
>
> Q. Yes, ma'am. From what you heard. And that opinion is that he is involved in the offense. And I understand that you have told us that you're an honest person. I have no doubt that you're not an honest person, ma'am. I believe you're an honest person. Otherwise, you wouldn't have said the things here to me this afternoon that you have said.
>
> What I do have—what assurances do I have that would let me know that you can set your opinions aside, the things that you have heard about this case and the things that you believe about [appellant], just totally wipe that out of your mind if you were on a jury?
>
> A. Well, you don't know my character because you don't know me because you have an opinion right now that I don't— you don't think that—I think that you have an opinion that you don't think that I could wipe aside my opinions. Does that make sense?
>
> Q. Yes, ma'am. It makes sense.
>
> A. That is how I'm feeling that you are judging me.
>
> Q. Okay. That is fair. That is a fair statement.
>
> A. Because you—you're doing your job. You're just making sure that I really would listen to everything, but I mean I can't convince you because you

don't know me, you only met me for— and read this stuff about me.

Appellant claims that Griffin was "self-deluded" into believing that she could be a fair juror. The trial court was in the best position to make that call. *See Colburn,* 966 S.W.2d at 517.

■ Appellant claims that the trial court should have granted his challenge for cause to Dickson (point seven) because she had formed an opinion about appellant's guilt which would prevent her from being an impartial juror. Our review of the record, however, indicates that Dickson testified that that any opinions that she had formed would not affect her ability to be fair to both sides. For example,

Q. [PROSECUTION]: The rule is the same. The law is the same. There is nothing wrong with—obviously, people are going to form opinions.

A. [VENIREMEMBER]: Right.

Q. They're going to decide whether they believe something or think they believe something or maybe not because of something they have read or seen. The law is the same. If you can set the opinions aside and not let it affect you here to be fair to both sides, that is all the law asks you.

A. Right.

Q. Do you feel you can do that?

A. Uh-huh.

Appellant claims that the "trial court erred in denying challenge of" Dickson. On this record, however, we cannot conclude that the trial court clearly abused its discretion to deny appellant's challenge for cause to Dickson who testified that she could set aside any of her pinions and be fair to both sides. *See Colburn,* 966 S.W.2d at 517.

■ Appellant claims that the trial court should have granted his challenge

for cause to Miller (point eight) because she had formed an opinion about appellant's guilt on the robbery element of the offense which would prevent her from being an impartial juror. The record reflects that Miller initially testified that she did not "really have an opinion" about appellant's guilt and that she could set aside any opinion that she had.

Q. [PROSECUTION]: Understanding the difference. We have had a couple of people come in and say I have formed an opinion but I can set it aside and still follow the law and listen to the evidence in the trial and let that guide me. See what I'm saying?

A. [VENIREMEMBER]: Yes, sir.

Q. You think you could do that?

A. Set it aside?

Q. Yes.

A. Yes, I do.

Q. I don't know if you have an opinion already or if you're just familiar with some things.

A. I don't really have an opinion. I have just read the articles, you know, that have been—

Q. Okay.

A. —publicized. But I really and truly don't think I have an opinion.

Q. Okay. That is fair. And what we hear from people often is, you know, they understand the media, TV, radio, newspaper, a lot of times doesn't report all of the particular details in a particular situation. Maybe they put their own spin or angle on it and flat out maybe they're wrong sometimes. See? And that is why I think the law says, regardless of what you have heard about, you have got to wait until you're in this courtroom and hear what is brought to you then.

A. Yes, I understand.

Q. I think that is fair?

A. I do.

Q. It sounds like you don't have a problem with that?

A. No, I don't.

Miller later testified that she believed that appellant was one of seven prison escapees who were involved in a robbery during which a police officer was killed. She testified, however, that any opinions that she had formed would not influence her in finding a verdict.

Q. [APPELLANT]: For ourselves. And really, I kind of look at it from the standpoint of if someone, you know, in a person's own family or a person that is a very close personal friend were seated over here in this chair rather than a stranger, would you want someone on the jury who has read or heard as much as you have heard or read in this case and formed the opinions that you have told us that you have formed? Would that be fair?

And could you say absolutely that what you have read and heard would not influence you in finding a verdict in this case. Now only you can tell me. Do you believe that the opinions that you have formed in this case would influence you in finding a verdict here, Ms. Miller?

A. [VENIREMEMBER]: I don't think so. I am a very fair person and I don't know, I don't think they would, but how do you know?

Later, in response to questioning by the trial court, Miller testified that she "guessed" that appellant was involved in the robbery but that she could base her verdict on the evidence presented at trial.

Q. [THE COURT]: Can you take an oath to God in good conscience that you will base your verdict in this case on the evidence you hear in this courtroom and disregard the evidence, what you think you have heard in newspapers and media?

A. [VENIREMEMBER]: Is that the question?

Q. Yes, ma'am.

A. Yes. Yes, I can do that.

Q. Now, I want to ask you this. You stated that you have established some conclusions concerning the defendant's guilt.

A. Did I say that?

Q. Well, you said you believe that he was—he escaped from prison and he was involved in the—

A. Well, I just—I thought the question was what did I know about the case or what had I read.

Q. Right.

A. That is the way I heard it.

Q. Okay. Of course, we ask questions differently. Two plus two is four but not always.

A. Okay.

Q. And the way I heard it, you have established—

A. That they escaped.

Q. Right.

A. Yes.

Q. Is that the extent of what you—the conclusions you have reached, that he escaped?

A. Well—

Q. Do you have any further than that with your conclusions?

A. My conclusions?

Q. Do you believe he was involved in the robbery of Oshman's?

A. Uh, yes, I guess I do.

Q. You believe he is involved in the murder of Officer Hawkins?

A. I don't know that. I don't know.

Q. Okay. So the answer to that is yes or no?

A. Do I believe that? Ask the question again.

Q. Have you established a conclusion that [appellant] was involved in the murder of Officer Hawkins?

A. No, sir. No, sir.

On this record, the trial court could have reasonably concluded that "no evidence [was] adduced" from Miller that any opinions she may have formed about appellant's guilt on the robbery element would influence her verdict. *See Curry,* 910 S.W.2d at 493. And, even if such evidence was adduced, Miller provided other testimony that she could reach a verdict based solely on the evidence that she heard at trial. We cannot conclude that the trial court clearly abused its discretion to deny appellant's challenge for cause to Miller based on these conflicting answers. *See Colburn,* 966 S.W.2d at 517. The trial court was in the best position to evaluate Miller's demeanor and responses. *See id.*

■ Appellant claims that the trial court should have granted his challenge for cause to Carter (point nine) because she had formed an opinion about appellant's guilt which would prevent her from being an impartial juror. In support of this claim, appellant relies on the following portions of Carter's voir dire testimony.

Q. [PROSECUTION]: Now, I understand what you're saying is that at this point you have formed an opinion that basically all of these guys were involved in a robbery where an officer was killed. Is that fair to say?

A. [VENIREMEMBER]: Yes.

Q. Now, it is real simple. Even though you have that information and have formed that opinion, can you set that aside, not rely on that for any information at all in the trial and base your verdict on what happens here in the courtroom?

A. Yes, I will listen to the circumstances.

Q. Okay.

A. All the—

Q. And will you disregard the information that you already know?

A. I think I can do that.

Q. Okay. And I am going to have to pick on you just a little bit. Whenever we hear I think, I can believe or I believe I can, it leaves one more maybe I can't.

A. You want yes or no?

Q. Yes. Can you do that? Can you set your opinions aside, the information you have and base your verdict on what hear [sic] here in the courtroom?

A. If it is—yeah, I will listen to all the information, yes.

Appellant claims that Carter was challengeable for cause because she "never said she could, or would, set aside her opinion, as if she could actually do that." Appellant further claims that the best Carter could do was to "promise to listen to the testimony." On this record, the trial court could have reasonably concluded that "no evidence [was] adduced" from Carter that any opinions she may have formed about appellant's guilt would influence her verdict. *See Curry,* 910 S.W.2d at 493. In any event, the record also reflects that Carter testified that she could set her opinions aside and base her verdict on the evidence presented at trial.

Q. [PROSECUTION]: The law says it is okay for you to have heard about this in the media. It is okay for you to even form opinions about what you have heard. But what the law says is that we need to have 12 people that can set aside any information they have heard, any opinions they may have formed and base their verdict solely on what they hear in

the courtroom. Okay? Does that sound like something that you can do?

A. [VENIREMEMBER]: Yes.

■ Appellant claims that the trial court should have granted his challenge for cause to Roberge (point eleven) because he had formed an opinion about appellant's guilt which would prevent him from being an impartial juror. The record reflects that Roberge testified that he could set aside any opinions he may have formed about the case and render a verdict based on the evidence presented at trial.

Q. [PROSECUTION]: Okay. And as you said—and I can't tell you what we are going to present. The law says neither side can tell you what the evidence will be in the trial. I can tell you this. I don't know if what you read is true or not. And like you said, you don't know if it is true or not. And you know, that is logical why the law says that is why you have to set it aside and you've got to be guided by what is presented to you in court. Any problem for you setting aside what you have heard already?

A. [VENIREMEMBER]: No, sir.

Q. Did you form any opinions one way of [sic] the other about things, about people?

A. I had some opinions, yes.

Q. Okay. Could you set those aside?

A. I could.

Q. Not let them affect whether we can prove the case or not, what your decision will be until you're in the courtroom and hear the courtroom testimony and the evidence?

A. Yes.

Appellant claims that Roberge obviously "was a prospective juror who had formed opinions about Appellant's guilt which would affect his ability to be a fair and impartial juror, his protestations notwithstanding." The trial court was in the best position to make that call. *See Colburn*, 966 S.W.2d at 517.

■ Appellant claims that the trial court should have granted his challenge for cause to Rupert (point thirteen) because he had formed an opinion about appellant's guilt which would prevent him from being an impartial juror. In support of this claim, appellant relies on the following portions of Rupert's voir dire testimony.

Q. [APPELLANT]: Okay. Fair enough. Now, let me ask you this one last question and we will go on to something else, just so I'm clear. Are we at a place where it would be fair to say that you have had pretrial publicity access, you have heard things, things that we have discussed, you have formed opinions about the things that you have heard, but at this point you're unsure whether they would influence your verdict or not?

A. [VENIREMEMBER]: I think that would be an accurate assessment.

Appellant claims that Rupert was challengeable for cause because he "was a juror who could not say, with certainty, that his opinions would not affect his ability to be fair and impartial." The trial court was in the best position to make that call. *See Colburn*, 966 S.W.2d at 517 (when veniremember "is persistently uncertain about his ability to follow the law, we will not second guess the trial court"). In addition, Rupert also testified that any opinions he may have formed would not influence his verdict.

Q. [PROSECUTION]: Okay. The law contemplates that we have—you know, that we are going to have jurors over here that have heard about this case, or any case for that matter, that has been

publicized in the media. Okay? The law says it is okay for you to have knowledge of the case, information from the media. It is okay for you to have formed opinions about what you have read or heard. Okay?

But the bottom line is this. If—what the law also provides for is you can have those opinions, that information, as long as you base your verdict on the law that is given in this courtroom and the evidence you hear in this courtroom and not let what you have heard outside influence your verdict. Does that make sense?

A. [VENIREMEMBER]: Yes, it does.

Q. Are you the type of person that could also allow that type of instruction and any information you have heard outside this courtroom about this case, you could leave outside and not let it influence your verdict and base your verdict on the evidence and the law from this courtroom?

A. Yes, I could.

Having concluded that the trial court did not erroneously deny appellant's challenges for cause to these nine veniremembers, it is unnecessary to decide whether the trial court erroneously denied his challenge for cause to Albrecht (point fourteen). *See Martinez,* 763 S.W.2d at 415. Points of error three through fourteen are overruled.

■ In point of error fifteen, appellant claims that the trial court erroneously admitted thirteen autopsy photographs (State's Exhibits 195–199 and 201–208) into evidence over appellant's objection under Tex.R.Evid. 403. The record reflects that the trial court overruled various objections that appellant made to the admission of these photographs.

[APPELLANT]: I expect that I do, Your Honor. I have not seen the photos today. I've seen them, but not today. Your Honor, at this time we would object to State's Exhibits 195, 196, 198, 199, 201, 202, 203, 204, 205, 206, 207, and 208 for the reason that I anticipate that the medical examiner will testify in great detail with respect to all the injuries depicted on those photographs. The injuries sustained by Officer Hawkins are not a matter of contention in this case. A manner and means of death are not at issue.

The defense would stipulate that this was a homicide, that the cause of death was by gunshot wounds, just as alleged in the indictment.

For that reason we would respectfully suggest to the Court that those photographs are irrelevant within the meaning of Rule 401 of the Texas Rules of Evidence.

Additionally, in the event the Court were to rule that there is some evidentiary value to those photographs, we would object under the provisions of Texas Rules of Evidence 404 that—403, that whatever relevance there may be to those photographs, the prejudicial effect substantially outweighs the evidentiary value of the photographs.

In addition, we object that the showing of the photographs would be a needless presentation of cumulative evidence, particularly 197 and 200, as they appear to depict essentially the same things, one being slightly closer than the other.

[THE COURT]: Mr. Shook, as to the 403, 404–B issues.

[PROSECUTION]: Judge, we don't believe it's cumulative. In fact, our medical examiner before he—he will testify that these are the photographs that he selected personally to best explain the gunshot wounds as they appear. We

edited many out of that. Those two are similar, but in his opinion he needed both of those to fully explain his testimony in conjunction with the mannequin on the bullet trajectory.

We feel that the fact that obviously the type of wounds received, the cause of death is a major part of this case, the multiple gunshot wounds are a major part of this case, and especially when several shooters were involved according to the evidence. And we can stipulate or wait for the medical examiner to come, but he will say that he needs all these photographs to fully explain his testimony to the jury.

There were several of the chest wounds, in fact, we edited that down so we wouldn't see the overall shot and he will explain that the sutures were put there by emergency room physicians. It was an injury caused at the scene.

[THE COURT]: Specifically looking at 197 and 200, it does appear that 197 shows everything that 200 does.

[PROSECUTION]: Going on memory, Judge, I think that this one obviously shows this [sic] higher wounds more to the eye and then the neck wound I think he used to explain. It's just memory. Also from memory offhand I don't remember which one he explained first, but these are the ones that he selected that also shows a closer up view of these wounds. We may could get by with one, zero in with our equipment and get a closer shot of it. I don't think that makes it any less more graphic.

[THE COURT]: He's made a cumulative objection, so I find that State Exhibit 200 is cumulative and contained within State 197. So I will sustain your objection to 200 and overrule your objection to all the other photographs that have been listed here.

The record also reflects that the medical examiner used these thirteen photographs to help explain his testimony about the victim's numerous gunshot injuries (the evidence showed that the victim was shot eleven times) and the abrasions the victim suffered when appellant and his fellow escapees ran over the victim with their car. For example,

Q. [PROSECUTION]: Could we start then with what you numbered gunshot wound No. 1. Where was that located?

A. [MEDICAL EXAMINER]: Gunshot wound arbitrarily designated No. 1 was a gunshot wound which entered the left forehead or eyebrow region and that bullet struck the eyebrow and then after striking the eyebrow, it went through the bone that part of skull [sic] and fractured the orbital plate which is the part of the skull that is just above the eyeball or the eye. And it fractured that part of the orbital plate and caused bruising and bleeding around the under surface of the left side of the brain and the frontal lobe area.

It went through the left eye and went through the maxillary sinus which is kind of in the cheek area, one of the sinus areas. It then went through the soft palate, which is that back part of the throat, the soft part, and then it crossed over, went through the right side of the tongue, and then I recovered a bullet in the right side of the neck musculature.

Q. State Exhibit 196, does that show the damage that was done to the left eye?

A. Yes.

. . . . . . . . . . . . . . . . . . . . . . .

Q. Gunshot wound No. 2, where was that located?

A. Gunshot wound No. 2 and 3 go together, and so through the same defect

area. So No. 2 went in through the left ear. It, after tearing through the left ear, then it went into the mastoid scalp, which is that part of the scalp that's just behind the ear, kind of that bony area that you can feel behind the ear. That bullet then penetrated in that part of the scalp and then embedded into the left neck musculature and went out the left neck musculature into the back part of the neck.

Q. Maybe I can turn the exhibit a little more towards the jury.

A. This would have been No. 2 and it exited the ear, reentered, and went through the musculature and then out.

Q. So it ultimately exited out the back of the neck?

A. Yes.

Q. And do we see that on the photograph?

A. Well, you can see the entrance area which is the left ear and it's really a combined entrance defect between 2 and 3. That doesn't really show the exit and reentrance, but that does show the original entrance.

Q. Does [Exhibit] 198 show the exit?

A. Yes. You can see that there's a defect on the back part of the ear and two holes in the mastoid scalp. So the bullet then enters into the mastoid scalp and exits out the back of the neck.

Appellant claims on appeal that "the trial court erred in allowing the State to introduce these 13 color photographs in what appears to be an attempt by the prosecution to introduce evidence meant to appeal to emotion rather than the fact finding process." Appellant further complains that one of these exhibits showed suturing and scars from emergency room attempts to save the victim's life. Appellant claims that "the prejudicial effect of the State's photographs far outweighed any possible probative value." The Rule 403 standard, however, is whether the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice." *See Robbins v. State*, 88 S.W.3d 256, 262–63 (Tex.Cr.App.2002) (each word of the Rule 403 standard is significant).

Appellant's claim boils down to the argument that it was "unfairly prejudicial" for the jury to see the autopsy photographs that helped explain the medical examiner's testimony [3] and that depicted wounds for which appellant was legally responsible because this evidence appealed to the jury's emotion. Our case law actually refers to an "undue tendency" to suggest decision on an "improper basis" such as an "emotional one." *See Rogers v. State*, 991 S.W.2d 263, 266 (Tex.Cr.App.1999) ("unfair prejudice" refers to "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). In this case, the matters depicted in the photographs giving rise to appellant's claim that they are "unfairly prejudicial" emanates from nothing more than the results of what appellant has participated in causing. *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex.Cr.App. 1995). And, the one photograph that included suturing also showed other injuries caused by appellant and his cohorts.

Under these circumstances, the trial court did not abuse its discretion in determining that any tendency of the photographs to suggest a decision on an emotional basis was not "undue." *See Rogers*, 991 S.W.2d at 266. And, even if there was an "undue tendency" to suggest a decision on an emotional basis (i.e., "unfair preju-

**3.** *See Ramirez v. State*, 815 S.W.2d 636, 647 (Tex.Cr.App.1991) (photographs admissible if verbal testimony as to matters depicted in the photographs is also admissible).

dice"), the probative value of the photographs was not "substantially outweighed" or even "outweighed" by this "unfair prejudice." *See Robbins,* 88 S.W.3d at 263. Point of error fifteen is overruled.

■■■ In point of error sixteen, appellant claims that the trial court violated his federal constitutional due-process rights "by refusing to instruct the jury that, when answering the future dangerousness [sic] special issue, the jury could consider that appellant was subject to a forty year [sic] minimum for parole eligibility if a life sentence were assessed." The record reflects that the trial court provided the parole instruction required by Article 37.071, § 2(e)(2)(B), Tex.Code Crim.Proc. Among other things, this instruction informed the jury that a life-sentenced appellant would not be eligible for parole for 40 years and that parole eligibility did not mean that parole would be granted.

The trial court denied appellant's request for another charge which would have instructed the jury that it could consider this parole law in answering the future-dangerousness special issue.

> [THE COURT]: The Court's charge, in your opinion, does it at this time correctly track the language of 37.071? It's just you want me to make an additional paragraph on how they are to use that section?
>
> [APPELLANT]: It correctly tracks the statute. I have no dispute about that. My concerns basically are two. My one concern is it's my belief under the provisions of Simmons versus South Carolina[4] and the language of Simmons ver-

sus South Carolina, the jury should be able to consider the parole law in determination of future dangerousness as it bears on how long a person will be incarcerated in the penitentiary.

> My second concern is that without that instruction there is no instruction to the jury with respect to what they can or cannot do with the parole law.
>
> [THE COURT]: Mr. Parks, I understand your argument. I'm simply not going to go there. I'm going to overrule your objection and track the statute exactly as it's given in the Code of Criminal Procedure.

The record further reflects that, during closing jury arguments, appellant urged the jury (or at least had the opportunity to urge the jury) to consider his parole eligibility when answering the future-dangerousness special issue.

> Because, you know, Warden Price said a person could be kept in administrative segregation as long as there is a concern of escape. And, frankly, ladies and gentlemen, I think it's a reasonable deduction from the evidence that not just [appellant], but everybody on that board is going to, as far as the penitentiary is concerned, be a risk of escape so long as they live. Maybe not, if they get to be 80 years old and are in a wheelchair. But until then.
>
> Because we know that [appellant] is doing a 99–year sentence for aggravated robbery. And we know what Warden Price told us about consecutive sentences. And we know from the Court's charge that a 40–year calendar sentence

**4.** *See Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 2200–01, 129 L.Ed.2d 133 (1994) (O'Connor, J., concurring) (when prosecution puts a defendant's future dangerousness at issue, due process requires allowing the defendant to bring his parole ineligibility to the jury's attention by way of argument by defense counsel or an instruction from the court); *compare Smith v. State,* 898 S.W.2d 838, 851 n. 19, cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995) (distinguishing the *Simmons* future-dangerousness concept from the Texas future-dangerousness concept).

for a life sentence is automatic. You have already given [appellant] that.

I believe it's a reasonable deduction under the circumstances of this case that if you were to answer one of these first two [special issues] no and the last [special issue] yes, that that life sentence would be stacked, would be caused to run consecutive with the 99–year sentence. [Appellant] would become eligible for parole sometime shortly before his hundredth birthday.

The trial court's refusal to provide an additional parole-eligibility instruction did not violate due-process. *See Smith*, 898 S.W.2d at 848–53 (due-process does not require a parole-eligibility jury instruction in Texas death penalty cases). Point of error sixteen is overruled.

 In point of error seventeen, appellant claims that "the Texas death penalty scheme violates due process protections of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt contrary to *Apprendi* and its progeny." We have decided this claim adversely to appellant. *See Blue v. State*, 125 S.W.3d 491, 500–01 (Tex.Cr.App.2003). Point of error seventeen is overruled.

In point of error eighteen, appellant claims that the "12–10" rule violates various federal constitutional provisions. In point of error nineteen, appellant claims that the trial court violated various federal constitutional provisions by failing to define the terms "probability," "continuing threat to society," and "criminal acts of violence." In points of error twenty and twenty-one, appellant claims that Texas death-penalty law violates various state and federal constitutional provisions by simultaneously restricting and allowing unlimited juror discretion to impose the death penalty. And, in points of error twenty-two and twenty-three, appellant contends that the cumulative effect of these constitutional violations also violated other state and federal constitutional provisions.

We have rejected these claims. *See Turner v. State*, 87 S.W.3d 111, 118 (Tex. Cr.App.2002), cert. denied, 538 U.S. 965, 123 S.Ct. 1760, 155 L.Ed.2d 519 (2003). Points of error eighteen through twenty-three are overruled.

We affirm the judgment of the trial court.

WOMACK, J., concurred.