COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-467-CR

ROBERT JONATHAN BIGLER APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

  ------------
  

Appellant Robert Jonathan Bigler appeals his conviction for murder.  In seven points, he contends that the trial court improperly overruled his motion to suppress, that the evidence is legally and factually insufficient to support the verdict, and that the trial court abused its discretion by admitting expert testimony and prejudicial evidence.  We affirm.

Dawn Sellers and Arthur Garcia, appellant’s co-defendant at trial, were dating during the spring of 2003.  Appellant was Arthur’s friend at the time.   During the course of Dawn and Arthur’s relationship, Bobby Chernay, the victim, began to harass Dawn by repeatedly coming to her house late at night while intoxicated. 

On July 2, 2003, Dawn, Arthur, and appellant were attending a pool party at the apartment complex of Dawn’s brother, Erik, when Dawn overheard appellant tell Arthur, “Let’s go talk to [Chernay] to tell him to leave—stop harassing [Dawn] . . . . [D]on’t be a pussy.”  Appellant continued to “egg[] on” Arthur the entire evening. 

Early the next morning, Arthur and appellant took Dawn home in Arthur’s car and then left together.  When they returned to Dawn’s house about an hour later, Dawn noticed that both men had blood on their clothes, that Garcia’s knuckles were swollen and bruised, and that he had a bump on his head and a bite mark on his arm.  Dawn also noticed that appellant had a red mark on his side when he took off his shirt.

Around 11:00 a.m. the same morning, Chernay’s roommate found Chernay lying on the floor in his bedroom.  He checked Chernay’s pulse, felt nothing, and then called the police.  By the time the paramedics arrived, Chernay was dead.  

Detective David Taylor of the Carrollton Police Department performed a death investigation.  When he arrived at the scene, Chernay was lying just inside the doorway into the bedroom wearing only a white T-shirt.  There was blood spatter on and beside the bed, a large amount of broken glass in the room from bottles or windows, some guitar stands that had been knocked over or broken in pieces, a broken guitar on the floor by Chernay, and a hat, some shirts, and some other bedding thrown on the floor.  Among the items found at the scene were appellant’s hat and Arthur’s shoes with Chernay’s blood on them.  

Appellant was indicted for the capital murder of Chernay, and he pleaded not guilty.  A jury found him guilty of murder, a lesser-included offense, and assessed his punishment at life imprisonment. 

In his first two points, appellant contends that the trial court erred by denying his motion to suppress evidence—specifically, blood and hair samples obtained as a result of a warrant—because the warrant does not, on its face, describe the place, persons, or things to be searched or seized with the particularity required by the Fourth Amendment.
(footnote: 2)
 We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.
(footnote: 3) 
 In reviewing the trial court’s decision, we do not engage in our own factual review.
(footnote: 4) 
 The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.
(footnote: 5) 
 Therefore, we give almost total deference to the trial court’s rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.
(footnote: 6) 
 But when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court’s rulings on mixed questions of law and fact.
(footnote: 7) 

When reviewing a trial court’s ruling on a mixed question of law and fact, we may review de novo the trial court’s application of the law of search and seizure to the facts of the case.
(footnote: 8) 
 When there are no explicit findings of historical fact, the evidence must be viewed in the light most favorable to the trial court’s ruling.
(footnote: 9)  We must uphold the trial court’s ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling.
(footnote: 10)  There is a strong preference for searches authorized by warrant, and we should interpret them in a commonsensical, rather than a hypertechnical, manner.
(footnote: 11)
 The two objectives of the law covering search warrants are to ensure there is adequate probable cause to search and to prevent a mistaken execution of the warrant against an innocent third party.
(footnote: 12)  These objectives are not furthered by a rigid application of the rules concerning search warrants.
(footnote: 13)  Technical discrepancies in the descriptive portions of a search warrant will not automatically void the warrant.
(footnote: 14)  Moreover, “a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.”
(footnote: 15)
 In assessing the sufficiency of an affidavit for a search warrant, we are limited to the four corners of the affidavit.
(footnote: 16)  We must interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences.
(footnote: 17)
 The requirement that a warrant particularly describe the place to be searched and the persons or things to be seized advances the constitutional objectives of  (1) ensuring that the officer searches the right place; (2) confirming that probable cause is in fact established for the place described in the warrant; (3) limiting the officer’s discretion and narrowing the scope of the search; (4) minimizing the danger of mistakenly searching the person or property of an innocent bystander; and (5) informing the owner of the officer’s authority to search that specific location.
(footnote: 18)  “Obedience to the particularity requirement both in drafting and executing a search warrant is therefore essential to protect against the centuries-old fear of general searches and seizures.”
(footnote: 19)  Thus, when a warrant and its supporting documents contain accurate and specific directions that meet these constitutional objectives, the particularity requirements of the Fourth Amendment are satisfied.
(footnote: 20)
 In this case, the search warrant uses words of incorporation, and an affidavit accompanied the warrant.  The warrant, in pertinent part, states,

[T]he Affiant . . . did . . . swear to said Affidavit before me (which . . . is by this reference incorporated herein for all purposes),

. . . .

[Y]ou are commanded to enter the suspected place, premises, and vehicle described in said Affidavit and to there search for the personal property and evidence described in said Affidavit and to seize and view the same and bring it before me.

In addition, the affidavit accompanying the search warrant states,

1.  There is in Denton County, Texas, a person described and located as follows:  Defendant, Robert Jonathan Bigler, a white male, Date of Birth 11/27/1979, located within the Denton County Jail.

2.  There is at said place a person with evidence described as follows: a representative sample of head hair with attached roots for comparison and constituting DNA evidence.  Blood and/or saliva constituting DNA evidence.  

3.  Said person has evidence controlled by each of the following persons:  Robert Jonathan Bigler.  

. . . . 

On July 25, 2003 Robert Bigler was arrested at Intercontinental Airport, Houston, Harris County, Texas.  Bigler’s belongings which included a duffle bag containing clothing were logged into his property.

Your Affiant knows that it is possible, through such scientific tests, to extract DNA from cellular material, that is unique to an individual, much like that of a fingerprint.  Your affiant further knows that the hairs collected from the defendant, Robert Jonathan Bigler, may be compared, through scientific analysis, to evidence collected from 2210 Benbrook Dr., Carrollton, Denton County, Texas.  

Wherefore, Affiant asks for issuance of a warrant that will authorize him to collect the listed evidence from Robert Jonathan Bigler and seize the same.    

The relevant facts that can be gleaned from reviewing both the warrant and the affidavit are that a person named Robert Jonathan Bigler, with the birth date of November 27, 1979, was located in the Denton County Jail and that he was in control of DNA evidence consisting of “head hair with attached roots,” blood, and saliva.  These descriptions are specific enough to ensure that the officers would search the right person and place; that there is probable cause to search the person and place in question; that the officers’ discretion would be limited; that there is no danger that the wrong person or place would be searched mistakenly; and that the officers had authority to search the person and place.
(footnote: 21)  Therefore, we hold that the trial court properly denied appellant’s motion to suppress, and we overrule appellant’s first and second points.  

In his third and fourth points, appellant asserts that the evidence is legally and factually insufficient to support the jury’s verdict because the State failed to meet its burden of proving appellant’s intent or proving that appellant caused Chernay’s death.  Appellant contends that the overwhelming weight of the evidence proves that Chernay’s death was either an accident or that another person murdered him using a stun gun.

The evidence shows that the evening before the murder, appellant was heard encouraging Arthur to go over to Chernay’s house to confront him.  Appellant was angry about the situation between Dawn and Chernay and kept “egging on” Arthur to confront him. 

On the night of the murder, appellant and Arthur dropped Dawn off at her house, left in Arthur’s car, and returned to Dawn’s home approximately an hour later.  Arthur had swollen, bruised knuckles, a bump on his head, and a bite mark on his arm; appellant had a red mark on his side.  Appellant’s hat and Arthur’s bloodied shoes placed both Arthur and appellant at the scene of the crime. 

Detective Gary Fernandez, the lead investigator in this case, testified that the blood on Arthur’s shoes was significant because it showed that pools of blood were already on the floor as Arthur walked through them.  He also stated that he believed that the severe beating to Chernay’s body was evidence of an intent to kill because “it goes to a point of almost being overkill.  He was beaten everywhere on his body, about his head, about the side of his body with a hard, rigid object.  It was not just fists . . . there was weapons used.”      

Detective Taylor noted the large amount of Chernay’s blood found on the scene: Chernay’s T-shirt was saturated with blood in the area near his stab wound; there was a large area of blood on and beside the bed, which looked like it had flowed down the side of the bed onto the floor; and blood was on the sheet, mattress, box spring, and sheet covering the box spring.  

The Tarrant County deputy medical examiner who performed Chernay’s autopsy concluded that the cause of Chernay’s death was blunt force injuries with a stab wound to the buttock.  Chernay’s body had thirty-four blunt force trauma wounds and a stab wound to his right buttock, which the medical examiner said were consistent with two different people striking with the same weapon.  He explained that Chernay bled to death from the buttock wound and that Chernay was unable to notice the severity of the wound because he was 

somewhat dazed . . . [or] that the relative severity of the pain [from the blunt force injuries] was possibly greater on [his] right side and therefore a stab wound to the buttock might not have hurt as much.   

The medical examiner also considered alternative causes of Chernay’s death, including an accident or a stun gun injury.   He testified, however,  that it was not possible that a stun gun caused Chernay’s death because the injuries underneath the surface wound did not appear to be electrical in nature.  He further stated that the cause of Chernay’s death was homicide, and not an accident, based upon the pattern of the wounds on Chernay’s body, the crime scene itself, and the fact that no weapon was found at the scene that was consistent with Chernay’s injuries. 

Dr. Randall Friese, a physician board certified in general surgery and trauma critical care, also reviewed the autopsy report and crime scene photographs.  He testified that it was possible for a person to die from a stab wound in the location in which Chernay was stabbed if he had lost a significant amount of blood.  He also explained that regardless of whether Chernay’s stab wound crossed a major blood vessel, he could have lost a significant amount of blood because muscular branches of arteries under arterial pressure can bleed vigorously.   

Dr. Harry Bonnell, a forensic pathologist who had been employed with the San Diego medical examiner’s office, testified for the defense.  Dr. Bonnell opined that the wound to the buttock could not have been the cause of Chernay’s death because the crime scene photos did not show that he lost enough blood.  Additionally, he did not believe that the stab wound to the buttock was consistent with a knife wound; but rather, he believed that the wound was caused by a jagged piece of bloody glass found on Chernay’s bed, on which Chernay could have fallen accidentally.  During cross-examination, however, Dr. Bonnell stated that he had not looked at the wound itself and that he had not seen how much blood had soaked into the mattress and carpet. 

Dr. Bonnell also believed that Chernay had an injury to the right side of his chest that was characteristic of a stun gun injury.  He explained that a stun gun can cause death if it applies high enough voltage to a certain area of the chest when the heart is in a particular rhythm.

Whether viewed in a light most favorable to the verdict,
(footnote: 22) or in a neutral light,
(footnote: 23) we conclude that there was sufficient evidence, including circumstantial evidence and expert medical testimony, from which a rational fact-finder could have found beyond a reasonable doubt that appellant murdered Chernay in this case.
(footnote: 24)  The evidence presented by appellant to support his alternative theories of the cause of Chernay’s death is not so strong that 
appellant’s guilt cannot be proven beyond a reasonable doubt.
(footnote: 25) 
 Accordingly, because the evidence is legally and factually sufficient to support the jury’s verdict, we overrule appellant’s third and fourth points. 
 

In his fifth and sixth points, appellant asserts that the trial court abused its discretion by permitting Dr. Friese to testify as a medical expert regarding Chernay’s cause of death because he does not have any experience in pathology.  He also contends that the trial court abused its discretion in admitting Dr. Friese’s testimony because his conclusions were based on possibility rather than “reasonable medical probability.”

The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court's discretion.
(footnote: 26)  Absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed.
(footnote: 27) 

The test for admitting expert testimony is set forth in rule 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
(footnote: 28)

The party proffering the expert witness bears the burden of showing that the witness is qualified on the specific matter in question.
(footnote: 29)  No rigid formula exists for determining whether a particular witness is qualified to testify as an expert.
(footnote: 30)  The special knowledge qualifying a particular witness as an expert may be gleaned entirely from studying technical works, obtaining a specialized education, practical experience, or a combination of the three.
(footnote: 31)  

An expert’s opinion must be more than “subjective belief or unsupported speculation,” but it need not reach the level of “known to a certainty” to be admissible.
(footnote: 32)  An expert may testify in the form of an opinion or inference.
(footnote: 33)
 The record shows that Dr. Friese graduated from medical school at the University of Maryland in 1990 and participated in a seven-year residency at the University of Colorado, two years of which were a fellowship in trauma research.  In 2001, he came to Dallas to do a trauma critical care fellowship at Parkland Hospital.  He is board certified in general surgery and trauma critical care.  At the time of trial, he was on the faculty at UT Southwestern Medical School and Parkland as Assistant Professor of Surgery in the Division of Burn Trauma Critical Care. 

As a trauma surgeon, Dr. Friese is responsible for the evaluation, diagnosis, and treatment of acutely injured patients.  His occupation has three parts: supervision, practice, and research.  About half of his time is spent in clinical practice at Parkland in the emergency room, operating room, and surgical intensive care.  Dr. Friese stated that he has treated over 500 stab wounds during his practice.  He testified that he gives opinions and makes decisions about cause of death in the hospital, although he is not trained to give opinions about cause of death in a courtroom.

We hold that the trial court did not abuse its discretion in finding that Dr. Friese was qualified to render expert testimony on whether an individual could die from a stab wound described in the autopsy report and shown in the crime scene photographs.
(footnote: 34) 

Appellant further contends that the trial court abused its discretion when it admitted Dr. Friese’s testimony because his conclusions were based on possibility rather than “reasonable medical probability.”  In support of this argument, appellant relies on civil case law, which he contends requires that a physician’s opinion testimony must be based upon “reasonable medical probability.”
(footnote: 35)  His reliance on this authority, however, is misplaced.  The court of criminal appeals has specifically rejected the use of such language in criminal cases because it improperly raises the State’s burden of proof from proof beyond a reasonable doubt to proof beyond all doubt.
(footnote: 36) 

The trial court did not abuse its discretion in admitting Dr. Friese’s expert testimony.  We overrule appellant’s fifth and sixth points.

In his seventh point, appellant asserts that the trial court abused its discretion by admitting nine photographs showing the numerous blunt force trauma injuries to Chernay’s face and head, various angles of Chernay’s body showing linear, paired abrasions, and the stab wound to Chernay’s buttock taken by the medical examiner before and during Chernay’s autopsy because they are more prejudicial than probative.  Specifically, he contends that a photograph of Chernay’s head showing the underlying soft tissue of Chernay’s skull after the skin was reflected from the right side of his scalp lacks any probative value and likely impressed the jury in an irrational way.   

Admissibility of photographs is within the discretion of the trial court.
(footnote: 37) Rule 403 provides that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.
(footnote: 38)   Unfair prejudice refers to “an undue tendency to suggest decision on an improper basis such as an emotional one.”
(footnote: 39)  Rule 403 favors admissibility and contains a presumption that relevant evidence will be more probative than prejudicial.
(footnote: 40)
 While the photographs at issue are graphic, they are highly probative regarding the cause of Chernay’s death and appellant’s intent, and their prejudicial effect, if any, is slight.  The State’s theory of the cause of death was that Chernay was severely beaten over his entire body and likely bled to death from a stab wound to the buttock because he was unable to realize the severity of the wound.  Appellant vigorously contested the conclusions of the State’s witness and presented alternative theories regarding the cause of Chernay’s death.  The photographs were highly probative on the issue of how badly Chernay was beaten and were necessary to show the full extent of his injuries.  Under the circumstances of this case, we cannot say that the trial court abused its discretion in admitting the photographs.  Therefore, we overrule appellant’s seventh point.  

Having overruled all of appellant’s points, we affirm the trial court’s judgment.  

JOHN CAYCE

CHIEF JUSTICE

PANEL A:  CAYCE, C.J.; HOLMAN and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  December 7, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
See
 
U.S. Const.
 amend IV.

3:
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 

4:
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). 

5:
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard
, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). 

6:
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); 
State v. Ballman
, 157 S.W.3d 65, 68 (Tex. App.—Fort Worth 2004, pet. ref’d). 

7:
Estrada v. State
, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); 
Johnson
, 68 S.W.3d at 652-53.

8:
Estrada
, 154 S.W.3d at 607. 

9:
Id
.

10:
Armendariz v. State
, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), 
cert. denied
, 541 U.S. 974 (2004); 
Ross
, 32 S.W.3d at 856; 
Romero
, 800 S.W.2d at 543.  

11:
See Illinois v. Gates
, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983);  
Serrano v. State
, 123 S.W.3d 53, 58 (Tex. App.—Austin 2003, pet. ref’d).  

12:
Bridges v. State
, 574 S.W.2d 560, 562 (Tex. Crim. App. 1978).

13:
Green v. State
, 799 S.W.2d 756, 757 (Tex. Crim. App. 1990).

14:
Bridges
, 574 S.W.2d at 562. 

15:
Groh v. Ramirez
, 540 U.S. 551, 558, 124 S. Ct. 1284, 1289-90 (2004); 
see also Long v. State
, 132 S.W.3d 443, 448 (Tex. Crim. App. 2004) (stating that courts must look to the warrant and affidavit together to determine whether the description of the place to be searched is sufficient, and when courts make such a determination, they should “follow a common sense and practical approach[,] . . . not a[n] overly technical one”).  

16:
Hankins v. State
, 132 S.W.3d 380, 388 (Tex. Crim. App. 2004) 
cert. denied,
 543 U.S. 944 (2004); 
Jones v. State
, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), 
cert. denied
, 507 U.S. 921 (1993).  

17:
Hankins
, 132 S.W.3d at 388; 
Jones
, 833 S.W.2d at 123. 

18:
See 
U.S. Const.
 amend. IV; 
Long
, 132 S.W.3d at 447-48. 

19:
Long,
 132 S.W.3d at 448 (quoting 
United States v. Heldt
, 668 F.2d 1238, 1257 (D.C. Cir. 1981), 
cert. denied
, 456 U.S. 926 (1982)). 

20:
See 
U.S. Const.
 amend. IV; 
Long
, 132 S.W.3d at 447-48.

21:
See Long,
 132 S.W.3d at 447-48; 
see also
 
Bridges
, 574 S.W.2d at 562 (holding that a warrant sufficiently described the place to be searched when there was no reasonable probability that the officers were authorized to search any other place);
 Haynes v. State
, 475 S.W.2d 739, 741 (Tex. Crim. App. 1972) (stating that where the warrant contains accurate directions as to how to locate the place to be searched and a showing is made that the place searched is the place described, the specificity requirement is met).

22:
See Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004) (setting out the legal sufficiency standard of review)
.

23:
See 
Watson v. State
, No. PD-469-05, 2006 WL 2956272, at * 8 (Tex. Crim. App. Oct. 18, 2006) (setting out the factual sufficiency standard).

24:
The jury was instructed that they could find appellant guilty of murder if, either as a coconspirator, party, or individually, he (1) intentionally or knowingly caused Chernay’s death, (2) intended to cause serious bodily injury and committed a dangerous act that caused Chernay’s death, or (3) committed a felony and in its commission or flight from it, he committed an act clearly dangerous to human life that caused Chernay’s death. 
See
 Tex. Penal Code Ann.
 §§ 7.02, 19.02(b) (Vernon 2006). 

25:
See 
Watson
, 2006 WL 2956272, at * 8
.

26:
Wyatt v. State
, 23 S.W.3d 18, 28 (Tex. Crim. App. 2000) 
cert. Denied
, 127 S. Ct. 19 (2006).

27:
See id.
;
 Penry v. State
, 903 S.W.2d 715, 762 (Tex. Crim. App. 1995). 

28:
Tex. R. Evid.
 702.

29:
Wyatt
, 23 S.W.3d at 28; 
Penry
, 903 S.W.2d at 762 .

30:
Matson v. State
, 819 S.W.2d 839, 851-52 n.10 (Tex. Crim. App. 1991).  

31:
Holloway v. State
, 613 S.W.2d 497, 501 (Tex. Crim. App. 1981); 
see also Carter v. State
, 5 S.W.3d 316, 319-20 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d) (stating that an expert witness may be qualified solely on the basis of practical experience).  

32:
Daubert v. Merrell Dow Pharm., Inc.
, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795 (1993); 
Grotti v. State
, No. 02-04-406-CR, 2006 WL 3334331, at * 26 (Tex. App.—Fort Worth Nov. 17, 2006, no pet. h.). 

33:
See 
Tex. R. Evid.
 703; 
Vela v. State
, 159 S.W.3d 172, 178 (Tex. App.—Corpus Christi 2004, pet. granted).  

34:
Although appellant contends that Dr. Friese testified regarding Chernay’s cause of death, the record reflects that Dr. Friese’s testimony before the jury was that it was “possible for an individual to die of a stab wound in that location and depth if a significant amount of blood loss has occurred.” 

35:
See Burroughs Wellcome Co.
 
v. Crye
, 907 S.W.2d 497, 500 (Tex. 1995); 
Duff v. Yelin
, 721 S.W.2d 365, 370 (Tex. App.—Houston [1st. Dist.] 1986), 
aff’d
, 751 S.W.2d 175 (Tex. 1988) (describing what level of medical testimony constitutes sufficient evidence of causation); 
Boone v. United Founders Life Ins. Co.
, 565 S.W.2d 380, 381-82 (Tex. Civ. App.—Fort Worth 1978, writ ref’d n.r.e.).  

36:
See Crocker v. State
, 573 S.W.2d 190, 207 (Tex. Crim. App. 1978)  (“We disavow the language in our opinion on original submission that addressed the sufficiency of the evidence to prove causation in terms of ‘reasonable medical probability.’  That term has no role to play in the law of burden of proof in criminal cases.”); 
see also Turro v. State
, 950 S.W.2d 390, 397 (Tex. App.—Fort Worth 1997, pet. ref’d) (stating that an expert’s opinion about cause and time of death does not have to eliminate all other possible causes of death)
. 

37:
Rayford v. State
, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003), 
cert. denied
, 543 U.S. 823 (2004).  

38:
Tex. R. Evid
. 
403; 
Rayford
, 125 S.W.3d at 529.

39:
Newberry v. State
, 135 S.W.3d 22, 43 (Tex. Crim. App. 2004).  

40:
Rayford
, 125 S.W.3d at 529
; 
Hayes v. State
, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).