Opinion issued October 8, 2009












 

 

 

 

 








In The

Court of Appeals

For The

First District of Texas







NO. 01-08-00797-CR

____________


ANDREW BARNES, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 183rd District Court

Harris County, Texas

Trial Court Cause No. 1179556






MEMORANDUM OPINION

 A jury found appellant, Andrew Barnes, guilty of the offense of murder (1) and
assessed his punishment at confinement for forty years. In five issues, appellant
contends that the evidence is legally and factually insufficient to rebut his claim of
self-defense, the trial court erred in excluding evidence of the complainant's
aggressive character and prior aggressive acts and in admitting autopsy photographs
that were more prejudicial than probative, and his trial counsel provided ineffective
assistance of counsel. 

 We affirm.

Background

 Houston Police Department ("HPD") Officer P. Jackson testified that on the
morning of September 3, 2006, he was dispatched to the home of sixty-nine-year-old
Robert Jackson, the complainant. An emergency dispatcher had received a telephone
call from the complainant's residence, but the caller did not speak into the phone. 
When he arrived at the complainant's house, Officer Jackson noted burglar bars
completely enclosed the front porch and front door and "the burglar bar doors were
locked." On the front door was a sign that read, "Occupants are armed; Intruders will
be shot." A window to the left of the front door, inside the enclosed front porch, was
broken. Because he was unable to enter through the front door, Jackson went around
the house, through an open gate, to the backyard, where he saw that "the back door
and all the windows were boarded up." Seeing nowhere to enter the house from the
backyard, Jackson returned to the broken window in the front of the house where he
heard what sounded like a radio playing at a low volume. Jackson looked through the
broken window and "saw what looked to be an outline of a person's upper torso" on
the floor. Jackson pounded on the house, yelled that he was a police officer, and
asked if everything was "okay." He then thought that he saw the person on the floor
raise his hand intermittently as if he needed help.

 Using a key that a neighbor showed him under the complainant's mailbox,
Officer Jackson entered the house and saw blood "all over"--on the kitchen counter,
on the floor, on a desk, and on a telephone. He saw the complainant sitting in a chair
by a desk with blood "on his face, all over his head, his arms, his hands, [and] his
legs." Jackson asked the complainant, "Do you know who did it?" The complainant
responded, "It's the boy that cuts my grass."

 HPD Officer R. King testified that when he arrived at the complainant's house
after Officer Jackson, he saw "blood spatter evidence on many surfaces" and a "pool
of coagulated blood" on the floor. King also saw a knife lying on the living room
floor.

 King explained that later in the day, he received information about a possible
suspect at appellant's house, which is two blocks away from the complainant's house. 
King and HPD Officer R. Moreno went to appellant's house and knocked on the door. 
A man answered the door and allowed them to enter the house, where they found
appellant standing in a bedroom closet. King informed appellant that he was under
arrest and searched him for weapons and identification. In appellant's left hip pocket,
King discovered the complainant's wallet. King also testified that appellant "could
have been under the influence of some substance that made him more lethargic" when
he was arrested.

 HPD Crime Scene Unit Officer D. Lambright testified that after he arrived at
the complainant's home, he collected a baseball bat that officers had found in a vacant
lot near the complainant's house. Lambright noted that the bat had blood and
scratches on it. When he examined the broken window at the complainant's home,
Lambright determined that it had been "broken with a blunt object" and "was struck
from the outside to the inside." Lambright explained that the blood spatter in the
complainant's living room indicated that the complainant had been bludgeoned. He
noted that the knife found on the living room floor only had small droplets of blood
on it, indicating that the knife had not been used to cut anyone.

 Lambright further testified that on a table in the complainant's master bedroom
he saw a "revolver-type handgun," which appeared to have "been there for a while." 
Lambright also saw a large number of pill bottles, with prescription labels made out
to the complainant, in the master bathroom and the living room. In the living room,
Lambright retrieved from the complainant's desk a notebook in which the
complainant had written appellant's name and phone number and a note that appellant
would cut the complainant's grass. Lambright retrieved this notebook because, at the
hospital, the complainant told HPD Sergeant J. Parker that the name of the person
who attacked him was on a pad on his table. 

 When Officer Lambright later went to appellant's house, he recovered from
appellant's room three bottles of pills with the complainant's name on them. One of
the bottles, which was labeled "Claritin D," was empty. The other two bottles
contained pills and were labeled "Hydralazine" and "Amoxi/Clav."

 Harris County Assistant Medical Examiner M. Anzalone testified that the
complainant died on March 1, 2007, after six months of "required chronic ventilatory
support and nursing home placement." Based on his autopsy on the complainant's
body, Anzalone opined that fractures on the complainant's skull indicated that he had
been hit in the head at least five times.

 Appellant testified that in 2000, when he was eleven years old, he began
mowing the complainant's lawn and would also do other jobs around his house. 
Sometimes the complainant would "just want to talk to [appellant] or have [him]
inside [the] house." At some point, the complainant began to "[t]ouch [appellant's]
private parts" approximately "once every couple of weeks." In 2005, when appellant
told the complainant that he "was tired of it and [he] didn't want it to go on anymore,"
the complainant "started cursing at [him] . . . and said that [appellant had] to let him
do things to [appellant] or [the complainant] was going to call the police," and accuse
appellant of stealing his wallet. The complainant did later accuse appellant of
stealing his wallet, and when HPD Officer Hadnot contacted appellant about the
accusation, appellant "made a statement that [he] didn't steal [the complainant's]
wallet that day." Appellant explained that the complainant further began to call
appellant's telephone "and threaten to kill [him]." However, they reconciled later that
summer, and appellant started working for him again.

 Appellant further testified that the complainant, over time, had given him many
bottles of pills and that the pill bottles found by police officers in his room had been
given to him sometime in 2004 or 2005. Although, appellant asserted that he had not 
stolen any pills from the complainant, he acknowledged that he had been convicted
of possessing a controlled substance in 2003 and of burglary in 2005.

 Appellant explained that at 10:30 p.m. on September 2, 2006, the complainant
picked him up from his house and drove him to the complainant's house, where the
complainant gave him seven or eight pills. After appellant swallowed five of the pills
and put the rest in his pocket, he then "passed out." When he awoke, the complainant
"was over [him], touching [his] private parts," and appellant said, "Let me out. I
don't want this to happen anymore." They began arguing, and the complainant said,
"I'm going to kill you, you little bastard." Appellant found the complainant's wallet
by the fireplace and said, "Is this the wallet you're going to accuse me of stealing? 
I'm going to take this to my mom and Officer Hadnot." Appellant explained that he
did not "intend to use it for [his] own gain." Appellant put the wallet in his pocket
and said, "Let me out right now." The complainant threatened appellant again and
then "opened his front door to let [appellant] out as [he] requested." 

 After appellant walked onto the front patio area, which was enclosed by the
locked burglar bars, the complainant "slammed the door . . . and started screaming he
was going to kill [appellant] and blow [his] head off." Appellant screamed for help
for about two minutes and then grabbed a baseball bat that was near the porch and
broke a window so that he could go into the house to "look for some keys or another
window that might be open without bars" to get away from the house. When he
entered the house through the window, appellant saw the complainant standing near
the kitchen with a knife in his hand. When appellant told the complainant to give him
a key and let him out, the complainant "came at [appellant] with the knife." 
Appellant then hit the complainant with the baseball bat. After hitting the
complainant, appellant "ran to the back part of the house looking for a window or
keys," but, finding nothing, he returned to the living room, where the complainant
attacked him again without the knife. Appellant "hit him some more times" until the
complainant fell down. Then appellant "jumped back through the window and . . .
[saw that he] might be able to squeeze through the top of the burglar bars." After
squeezing through the bars, appellant went back to his house.

 On cross-examination, appellant testified that he had cut his hands and arms
when he crawled through the broken window. He admitted that he did not see the
complainant with a firearm in his hands that night even though the complainant had
approximately two minutes to retrieve the firearm from his bedroom while appellant
was on the front porch. Appellant agreed that when he first hit the complainant with
the baseball bat, he hit him on the head. Then, returning to the living room, appellant
hit him on the head "around four or five times" with the baseball bat even though the
complainant did not "have a knife or gun in his hand at the time." When he struck the
complainant with the last several blows, appellant agreed that the complainant had
dropped to one knee.

 Sandra Villalta and Ben Amos, who lived in the same neighborhood as the
complainant and appellant, both testified about numerous incidents in which the
complainant threatened to kill them and had used crude and abusive language towards
them. Villalta testified that the complainant, who had threatened to kill her husband,
had previously accused her husband of stealing from him and trespassing on his
property. Amos testified that once, when he was driving down the complainant's
street, the complainant came at him with a baseball bat and a gun and threatened to
kill him. HPD Officer A. Castillo testified that the complainant had previously called
him to complain about neighbors trespassing on his property and that the complainant
had threatened three times to kill his neighbors if they did not stop. HPD Officer D.
Carbajal testified that he previously responded to a call from the complainant who
alleged that appellant had stolen money from his wallet. Carbajal explained that the
complainant did not want to "pursue charges. [The complainant] just wanted to cover
his end of the deal - he wanted to cover himself in case the [appellant] stated he
fondled him."Sufficiency of the Evidence In his first and second issues, appellant argues that the evidence is legally and
factually "insufficient to rebut appellant's claim of self defense" because the evidence
established that appellant "reasonably believed he could not have retreated . . .[,] that
[the complainant] was about to use deadly force against him . . .[, and] that he had to
protect himself by the use of deadly force."

 We review the legal sufficiency of the evidence by considering all of the
evidence in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)
(citing Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2788-89 (1979)). 
In doing so, we give deference to the responsibility of the fact-finder to fairly resolve
conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the
facts. Id. However, our duty requires us to "ensure that the evidence presented
actually supports a conclusion that the defendant committed" the criminal offense of
which he is accused. Id. 

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
afford due deference to the jury's determinations. Marshall v. State, 210 S.W.3d 618,
625 (Tex. Crim. App. 2006). Although we should always be "mindful" that a jury is
in the best position to decide the facts and that we should not order a new trial simply
because we disagree with the verdict, it is "the very nature of a factual-sufficiency
review that . . . authorizes an appellate court, albeit to a very limited degree, to act in
the capacity of a so-called 'thirteenth juror.'" Watson, 204 S.W.3d at 416-17. Thus,
when an appellate court is "able to say, with some objective basis in the record, that
the great weight and preponderance of the (albeit legally sufficient) evidence
contradicts the jury's verdict[,] . . . it is justified in exercising its appellate fact
jurisdiction to order a new trial." Id. at 417.

 A person is justified in using deadly force if he has a reasonable belief that it
is immediately necessary to protect himself from another's use of deadly force and
a reasonable person in his place would not retreat. See Tex. Penal Code Ann.
§§ 9.31(a), 9.32(a) (Vernon 2003). (2) A defendant has the burden of producing some
evidence to support a claim of self-defense. Zuliani v. State, 97 S.W.3d 589, 594
(Tex. Crim. App. 2003) (citing Saxton v. State, 804 S.W.2d 910, 913-14 (Tex. Crim.
App. 1991)). Once a defendant presents evidence of self-defense, the State has the
burden of persuasion in disproving the evidence of self-defense. Id. The State is not
required to produce evidence refuting the self-defense claim; the State need only
prove its case beyond a reasonable doubt. Id. A jury verdict of guilty is an implicit
finding rejecting a defendant's self-defense theory. Id. 

 When an appellant challenges the legal sufficiency of the rejection of a self-defense claim, it is well-settled law that appellate courts "look not to whether the
State presented evidence which refuted appellant's [defensive evidence], but rather
we determine whether after viewing all the evidence in the light most favorable to the
prosecution, any rational trier of fact would have found . . . against appellant on the
[defensive] issue beyond a reasonable doubt." Saxton, 804 S.W.2d at 914. In a
factual sufficiency review of the rejection of a self-defense claim, we review "all of
the evidence in a neutral light and [ask] whether the State's evidence taken alone is
too weak to support the finding and whether the proof of guilt, although adequate if
taken alone, is against the great weight and preponderance of the evidence." Zuliani,
97 S.W.3d at 595.

 In support of his legal sufficiency challenge, appellant emphasizes that the
complainant had a reputation in the community for carrying a weapon and for
aggressive conduct; the complainant's home had a sign on the front door stating,
"Occupants are armed; Intruders will be shot"; the burglar bars and sealed windows
in the complainant's home made leaving the home difficult; a handgun was lying on
a TV stand in the complainant's bedroom; a bloody knife was found near the
complainant's body; and appellant knew the complainant had weapons, feared the
complainant, and believed the complainant would kill him. 

 Viewing all of the evidence in the light most favorable to the verdict, we note
the critical fact that appellant was able to climb into, or out of, the complainant's
front porch through the locked burglar bars. He broke the complainant's window to
enter the house and struck the complainant with a baseball bat several times even
after the complainant had dropped his knife and had fallen to one knee. The
complainant's wallet and medicine were subsequently found in appellant's bedroom. 
 Given this evidence, a reasonable trier of fact could have disbelieved
appellant's explanation that he had struck the complainant repeatedly with a baseball
bat because he was in fear of his life. A reasonable trier of fact could have found that
appellant either did not have a reasonable belief that such force was immediately
necessary to protect himself or that he could have retreated. Accordingly, we hold
that the evidence is legally sufficient to support the jury's implied finding that
appellant was not justified in using deadly force.

 In support of his factual sufficiency challenge, appellant emphasizes that the
complainant "had an aggressive, quarrelsome character" and a reputation in the
community for "displaying weapons to threaten neighbors and passers-by"; the
complainant's house "was a fortress with limited means of egress"; the complainant
owned weapons; and the complainant had threatened to kill appellant and others in
the neighborhood numerous times.

 Viewing the evidence in a neutral light, it is true that the complainant had
previously threatened to kill certain neighbors, passers-by, and appellant. The
complainant had charged others, either while carrying a bat or other implement, but
he never actually physically assaulted any of them. Appellant himself testified that
before any violence had occurred, the complainant let him out of the house onto the
front porch. Most importantly, although burglar bars enclosed the front porch and
appellant testified that he had broken back into the house only to find another way to
leave, appellant also testified that he was later physically able to squeeze through the
bars to leave the home. The complainant did have a knife in his hand when appellant
re-entered the house, but appellant testified that the complainant dropped the knife
after appellant hit him with the baseball bat. Appellant also admitted that he did not
see the complainant with any other kind of weapon in his hands after he struck the
complainant, and he testified that he hit the complainant an additional four or five
times in the head, striking the final blows after the complainant had dropped to one
knee. 

 Viewing the evidence in a neutral light, a reasonable trier of fact could have
concluded that it was not necessary for appellant to use deadly force or that a
reasonable person in appellant's place would have retreated. See Tex. Penal Code
Ann. §§ 9.31(a), 9.32(a). Thus, we conclude that the verdict is not "clearly wrong
and manifestly unjust" and the proof of guilt is not against the great weight and
preponderance of the evidence. See Watson, 204 S.W.3d at 414-15. Accordingly, we
hold that the evidence is factually sufficient to support the jury's implied finding that
appellant was not justified in using deadly force.

 We overrule appellant's first and second issues.

Excluded Testimony

 In his third issue, appellant argues that the trial court erred in excluding
testimony from five witnesses--Lydia Winterrowd, Brian McIlwain, Troy Pope,
Joseph Santhoff, and James Santhoff--because their testimony that the complainant
"had an aggressive character and had committed prior aggressive acts" was
"probative of [the complainant's] state of mind" and its probative value was not
outweighed by the danger of unfair prejudice. See Tex. R. Evid. 404(a)(2), 403. We review a trial court's decision to admit evidence for an abuse of discretion.
Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). An "appellate court
will not reverse a trial court's ruling unless that ruling falls outside the zone of
reasonable disagreement." Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App.
2002).

 In a murder prosecution, a defendant who raises the issue of self-defense may
introduce evidence of the violent character of the complainant in the form of 
"opinion or reputation testimony to prove the deceased acted in conformity with his
violent nature." Id.; see Tex. R. Evid. 404(a)(2). "Specific, violent acts of
misconduct may only be admitted to show the reasonableness of the defendant's fear
of danger, or to show that the deceased was the first aggressor." Torres, 71 S.W.3d
at 760. Such specific acts are admissible only to the extent that they have relevance
apart from their tendency to show character conformity. Id. The defendant may offer
testimony about specific violent acts that show the reasonableness of the defendant's
fear of danger if the defendant was aware of the violent acts. Id. 

 However, if the defendant was unaware of the specific violent acts, he may use
those prior specific acts of violence relevant to the ultimate confrontation to show that
the deceased was the first aggressor by "demonstrating the deceased's intent, motive,
or state of mind." Id. at 760-61; see Tex. R. Evid. 404(b); 1 Steven Goode, Olin
Guy Wellborn, III, & M. Michael Sharlot, Texas Practice: Guide to the
Texas Rules of Evidence: Civil and Criminal § 404.4, at 157 (2d ed. 1993 &
Supp. 2001) (noting that specific violent acts are admissible to show that deceased
had motive or intent to be first aggressor). Before a specific, violent act is introduced,
there must be some evidence of a violent or aggressive act by the deceased that tends
to raise the issue of self-defense and that the specific act may explain. Torres, 71
S.W.3d at 761. "Then, as long as the proffered violent acts explain the outward
aggressive conduct of the deceased at the time of the killing, and in a manner other
than demonstrating character conformity only, prior specific acts of violence may be
admitted to show the deceased was the first aggressor even though those acts were not
directed against the defendant." Id. at 762 (emphasis added). 

 For example, in Torres, evidence that the deceased had previously threatened
to kill his ex-girlfriend's aunt and her children was admissible to show that the
deceased was the aggressor because it explained the deceased's conduct toward the
defendant, i.e., that he had "a mind set of violence against those who might stand
between him and" his ex-girlfriend or the "intent or motive of getting back with [his
ex-girlfriend] one way or another or keeping others away from [her] by violence if
necessary." Id. at 762. In Jenkins v. State, evidence that the deceased had a prior
conviction for assault with intent to murder was admissible to show that the deceased
was the aggressor because there was evidence of some act of aggression by the
deceased, which the prior act tended to explain, i.e., the deceased verbally threatened
to kill the defendant and put his hand in his pocket just before the defendant shot him. 
 625 S.W.2d 324, 325-327 (Tex. Crim. App. 1981). In Tate v. State, evidence that
two months prior to his death the deceased made a statement that he might have "to
kill the little son of a bitch [the defendant] some day" was admissible to show that the
deceased was the first aggressor because it "was probative of his state of mind and
possibly indicated a motive or demonstration of intent behind the confrontation" with
the defendant. 981 S.W.2d 189, 193 (Tex. Crim. App. 1998).

 Here, Winterrowd's proffered testimony was that the complainant had
discharged a firearm outside her front door, left human feces at her door, and
attempted to "run [her] over with his car" as she was walking through a parking lot. 
Appellant's trial counsel argued that her testimony was admissible as reputation
evidence and as specific "bad acts." Joseph and James Santhoff both testified that
they saw the complainant walk down his driveway and wave his fist or gardening
tools at them as they drove past his house. Additionally, James Santhoff testified that
one morning the complainant waved him down as he drove by, opened his car door,
and began "yelling at [Santhoff] and screaming profanities, saying he was going to
kick [Santhoff's] butt and that he was mad that [Santhoff] was driving so fast down
his street." Appellant's trial counsel argued that this testimony demonstrated that the
complainant had "a violent temper" and would counter the State's argument that the
complainant was a "frail, tiring, old man in his dotage."

 On appeal, appellant asserts that the testimony of Winterrowd and the
Santhoffs about specific acts of the complainant is "probative of [his] state of mind"
to show he was the aggressor. Appellant did present evidence of violent and
aggressive acts committed by the complainant that tended to raise the issue of self-defense. However, in his brief, appellant does not offer any explanation as to how the
complainant's acts towards Winterrowd and the Santhoffs is probative as to the
complainant's state of mind during the incident in question. See Tex. R. Evid.
404(b); Torres, 71 S.W.3d at 760.

 To be admissible, a witness' testimony about the aggressive conduct of a
complainant must explain the aggressive conduct toward a defendant at the time of
the confrontation and in a manner other than demonstrating character conformity
only. Torres, 71 S.W.3d at 762. Here, appellant did not explain to the trial court and
does not explain in his brief how the testimony of Winterrowd and the Santhoffs
demonstrates more than character conformity. Unlike the situations presented in
Torres, Jenkins and Tate, where the witnesses' testimony about the deceaseds' prior
violent acts clarified the deceaseds' confrontations with the defendants, appellant
offers no explanation as to how the complainant's actions towards Winterrowd and
the Santhoffs clarify his actions toward appellant during the incident in question.
Accordingly, we hold that the trial court did not err in excluding the testimony of
Winterrowd and the Santhoffs.

 Regarding the testimony of Pope, appellant's trial counsel asserted only that
Pope's testimony was admissible "to show that [the complainant was] not a feeble old
man in his dotage." Appellant's trial counsel did not assert that Pope's testimony was
admissible to prove the complainant's aggressive character and prior aggressive acts.
"Appellate courts may uphold a trial court's ruling on any legal theory or basis
applicable to the case, but usually may not reverse a trial court's ruling on any theory
or basis that might have been applicable to the case, but was not raised." Martinez
v. State, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002). To preserve a complaint, the
record must show that an appellant raised a timely request stating "the grounds for the
ruling that the complaining party sought from the trial court with sufficient specificity
to make the trial court aware of the complaint, unless the specific grounds were
apparent from the context." Tex. R. App. P. 33.1(a)(1)(A). Because appellant did not
request that the trial court allow Pope to testify about the complainant's aggressive
character or prior aggressive acts, he has not preserved this complaint for review. Id.

 Regarding the testimony of McIlwain, appellant asserts that McIlwain would
have shown "that [the appellant's] house was strewn with liquor bottles and pill
bottles." However, he does not explain in his briefing how the trial court erred in
excluding this testimony. "The brief must contain a clear and concise argument for
the contentions made, with appropriate citations to authorities and to the record."
Tex. R. App. P. 38.1(I). Appellant has inadequately briefed this issue, and, thus, it is
waived.

 Accordingly, we hold that the trial court did not err in excluding the testimony
of Pope and McIlwain.

 We overrule appellant's third issue.Autopsy Photographs

 In his fourth issue, appellant argues that the trial court erred in admitting into
evidence certain autopsy photographs--State's Exhibits 112, 114, 119, 121, 124, 127,
and 130-35--because the probative value of these photographs is substantially
outweighed by their prejudicial effect. See Tex. R. Evid. 403.

 The trial court allowed assistant Medical Examiner M. Anzalone to select
photographs "that you need [that] would help the jury to understand the deceased's
injuries that you are going to be testifying to," and appellant objected to the
admission into evidence of the photographs. State's Exhibit 112 shows the
complainant's body under hospital sheets with feeding tubes attached to him; 114
shows a close up of the complainant's head; 119, 121 and 124 show close ups of the
complainant's shaved head from different perspectives to reveal his wounds; 127, 131
and 132 show the complainant's skull with the skin pulled back to display fractures
on the right, back, and left sides of his skull, respectively; 130 shows the airway
attachment of the right lung with mucus plugging the airway; 133 shows the
complainant's skull opened to reveal contusions and bruises on his brain; and 134 and
135 show the complainant's brain removed from the skull to reveal bruises and
contusions on the right side and on the base of his brain.

 In order to be admissible, photographs must be relevant to the solution of a
disputed fact issue. Lanham v. State, 474 S.W.2d 197, 199 (Tex. Crim. App. 1972).
Autopsy photographs provide powerful visual evidence of an offense, and a trial court
does not abuse its discretion in admitting photographs of a complainant into evidence
merely because they may be gruesome. Sonnier v. State, 913 S.W.2d 511, 519 (Tex.
Crim. App. 1995). Relevant photographs may, however, be excluded if their
probative value is substantially outweighed by the danger of unfair prejudice. Tex.
R. Evid. 403. In determining the prejudicial effect of photographs, we consider (1)
the number of photographs, (2) the size of photographs, (3) whether the photographs
are in color or black and white, (4) the detail shown in the photographs, (5) whether
the photographs are gruesome, (6) whether a body shown in the photographs is naked
or clothed, and (7) whether the photographed body has been altered since the crime
in some way that might enhance the gruesomeness of the photograph to an appellant's
detriment. Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000). 

 Appellant first argues that the probative value of the photographs is low
because he did not deny striking the complainant with the bat or contest that the
blows led to the complainant's death. Nevertheless, autopsy photographs showing
the cause of a complainant's death are admissible even when a defendant does not
contest the cause of death. Newbury v. State, 135 S.W.3d 22, 41-44 (Tex. Crim. App.
2004).

 Appellant next argues that the probative value of the photographs is low
because "there was a substantial gap in time between the blows struck by [a]ppellant
on September 3, 2006" and the complainant's death, "[c]onsequently the photos
represented [the complainant] not as he was immediately after the blows struck by
[a]ppellant, but as he became after seven months in the hospital." However, appellant
does not explain how the time between the attack and the complainant's death and
autopsy impacts the probative value of these photographs. The photographs show
skull fractures that indicate that the complainant had been struck in the head at least
five times, a relevant fact in this case. Thus, the photographs had probative value that
was not substantially outweighed by the danger for unfair prejudice even though not
taken immediately after the blows were struck.

 Appellant next argues that the photographs labeled as exhibits 127 and 130-35
should have been excluded because they depict mutilation resulting from the autopsy. 
Dr. Anzalone used the photographs to explain the nature and extent of the
complainant's internal injuries resulting from the blows from the bat. The
photographs are no more gruesome than would be expected. See Sonnier, 913
S.W.2d at 519. When the power of the photographs comes from "nothing more than
what the defendant has himself done we cannot hold that the trial court has abused
its discretion merely because it admitted the evidence." Id. 

 In regard to exhibit 130, which shows a cutaway of the complainant's right
lung with mucus clogging the airway, Dr. Anzalone used this photograph to explain
the ultimate cause of the complainant's death. She testified that the complainant died
from "complications following blunt head trauma with skull fractures, subdural
hemorrhage and brain contusions." Mucus plugging the airway to the lung is a
frequent occurrence in people, such as the complainant, who have been mechanically
ventilated. If verbal testimony is relevant, photographs of the same are also relevant. 
Gallo v. State, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Because Dr. Anzalone
could properly testify about the factors contributing to the cause of the death of the
complainant, such as mucus that clogged his right lung, the trial court did not abuse
its discretion in admitting this photograph.

 Finally, appellant argues that the State invested more time in admitting these
photographs than their probative value would warrant because there are forty pages
of testimony from the medical examiner developing this evidence. See Hall v. State,
137 S.W.3d 847, 855 (Tex. App.Houston [1st Dist.] 2004, pet. ref'd). In Hall, the
medical examiner's testimony was only twenty-nine pages long out of hundreds of
pages of testimony in the record. The court held that the six pages of testimony
covering the three objected-to photographs did not unduly lengthen the trial. Id. 
Here, the record is also several hundred pages long, and Dr. Anzalone referenced the
objected-to photographs periodically in about thirteen pages out of over fifty-five
pages of her testimony. As in Hall, Dr. Anzalone's testimony regarding the objected-to photographs did not inordinately prolong the trial or unduly focus the jury on the
photographs.

 Accordingly, we hold that the probative value of the photographs was not
substantially outweighed by any prejudicial effect and the trial court did not err in
admitting the autopsy photographs into evidence.

 We overrule appellant's fourth issue. 

Ineffective Assistance of Counsel

 In his fifth issue, appellant argues that his trial counsel provided ineffective
assistance because counsel made statements during voir dire that "undermine[d]
[a]ppellant's self-defense theory" and asked "only minimal questions to determine if
there were any prospective jurors who would not be able to follow the law on self-defense"; did not, during his closing argument in the guilt phase of the trial, "cite the
self-defense charge, interpret the meaning in lay language, and illustrate how it applied
to the facts"; and, during the punishment phase of the trial, did not "present medical
and psychiatric testimony about [a]ppellant to help the jury understand why he acted
as he did." 

 The standard of review for evaluating claims of ineffective assistance of counsel
is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064
(1984). Strickland requires a two-step analysis whereby an appellant must show that
(1) counsel's performance fell below an objective standard of reasonableness, and (2)
but for counsel's unprofessional error, there is a reasonable probability that the result
of the proceedings would have been different. Id. at 687-94, 2064-68; Thompson v.
State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A reasonable probability is a
"probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S.
at 694, 104 S. Ct. at 2068. A failure to make a showing under either prong defeats a
claim for ineffective assistance. Rylander v. State, 101 S.W.3d 107, 110 (Tex. Crim.
App. 2003).

 Moreover, an appellant must prove ineffective assistance by a preponderance
of the evidence. Robertson v. State, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006);
Gamble v. State, 916 S.W.2d 92, 93 (Tex. App.--Houston [1st Dist.] 1996, no pet.). 
The assessment of whether a defendant received effective assistance of counsel must
be made according to the facts of each case. Thompson, 9 S.W.3d at 813. We must
look to the "totality of the representation and the particular circumstances of each
case" in evaluating the effectiveness of counsel. Id. In so doing, we must also
recognize the strong presumption that counsel's performance fell within the wide
range of reasonable professional assistance. Strickland, 466 U.S. at 688, 104 S. Ct.
at 2064-65; Thompson, 9 S.W.3d at 813. To defeat this presumption of reasonable
professional assistance, "any allegation of ineffectiveness must be firmly founded in
the record, and the record must affirmatively demonstrate the alleged ineffectiveness." 
McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), abrogated on other
grounds by, Mosley v. State, 983 S.W.2d 249 (Tex. Crim. App. 1998). Rarely will a
reviewing court be provided the opportunity to make its determination on direct appeal
with a record capable of providing a fair evaluation of the merits of the claim
involving such a serious allegation. Thompson, 9 S.W.3d at 813. However, a single
egregious error of omission or commission by counsel has been held to constitute
ineffective assistance, even in the absence of a record setting forth counsel's reasons
for the challenged conduct. Vasquez v. State, 830 S.W.2d 948, 951 (Tex. Crim. App.
1992) (per curiam); Valencia v. State, 966 S.W.2d 188, 191 (Tex. App.--Houston [1st
Dist.] 1998, pet. ref'd); Laurant v. State, 926 S.W.2d 782, 783 (Tex. App.--Houston
[1st Dist.] 1996, pet. ref'd). In the rare case where the record on direct appeal is
sufficient to prove counsel's performance was deficient, an appellate court should
address the claim. Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000). Voir Dire Questioning

 Appellant asserts that his trial counsel devoted his entire voir dire to the subject
of self-defense but his approach "hampered [him] in his obligation to educate members
of the jury panel about the requirements of self-defense." Also, appellant complains
that trial counsel used a hypothetical that supported the State's theory of the case and
"led jurors to misunderstand what Appellant's defense was likely to be." Trial counsel
did use a hypothetical that was not entirely consistent with the facts of the case to
illustrate the concept of self-defense. However, the hypothetical was only one
technique trial counsel employed to educate the jury about self-defense. He also
explained that "you have to put yourself in the shoes of the person claiming [self-defense] and look at it from his standpoint alone at the time he claims it and evaluate
it." Trial counsel further explained that "a person asserting self-defense can consider
the words spoken along with the bodily language that's being used by the person [he
acts] in self-defense against" in determining the reasonableness of the person's
actions. Trial counsel emphasized the law of self-defense throughout voir dire,
leading any prospective jurors who had trouble with the hypothetical back to the basic
principle that "you as a citizen have a right to use deadly force against another who
you reasonably believe is about to cause you serious bodily injury or death." On these
facts, we cannot conclude that appellant's trial counsel's performance was deficient.

 Final Argument on Guilt or Innocence

 Appellant next asserts that the "court's charge include[d] many legal terms and
concepts whose meaning would not be immediately clear to the members of the jury"
and that "[h]ad defense counsel explained the charge to the jury and explained how the
defense evidence satisfied its requirement" the outcome likely would have been
different. 

 At the beginning of his closing argument, trial counsel stated "I'm not going to
get into the jury charge. You people are plenty intelligent and can read this thing
yourselves." From the record, trial counsel's strategy focused on the story of the
relationship between appellant and the complainant and how that led up to both the
incident in question and how appellant reacted during the incident. He did remind the
jury that in determining the facts and applying them to the charge that "as we've all
agreed, you have to look at it from [appellant's] point of view as he saw it at the time. 
And you have to consider the relationship between the parties." He also admonished
the jury to consider the reasonableness of appellant's actions in the situation, his right
to defend himself, his right to try to live, and the real danger that appellant faced. 
Trial counsel further highlighted weaknesses in the State's theory that this was a
homicide committed during a burglary or robbery. He also pointed out uncontroverted
evidence from appellant and from the complainant's neighbors that supported
appellant's self-defense claim. It is apparent that the jury understood the argument
because it acquitted appellant of the offense of capital murder and found him guilty
of the lesser offense of murder. Thus, we cannot say trial counsel's performance was
deficient.

 Punishment Phase

 Appellant next asserts that, during the punishment phase, trial counsel failed to
present medical and psychiatric testimony about appellant "to help the jury understand
why [appellant] acted as he did."

 The decision whether to present witnesses is largely a matter of trial strategy. 
See Rodd v. State, 886 S.W.2d 381, 384 (Tex. App.--Houston[1st Dist.] 1994, pet.
ref'd). Moreover, an attorney's decision not to present particular witnesses at the
punishment stage may be a strategically sound decision if the attorney bases it on a
determination that the testimony of the witnesses may be harmful, rather than helpful,
to the defendant. See Weisinger v. State, 775 S.W.2d 424, 427 (Tex. App.--Houston
[14th Dist.] 1989, pet. ref'd) (holding that it is trial counsel's prerogative, as matter
of trial strategy to decide which witnesses to call). However, a failure to uncover and
present mitigating evidence cannot be justified as a tactical decision when defense
counsel has not conducted a thorough investigation of the defendant's background.
Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Rivera v. State,
123 S.W.3d 21, 31 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd). 

 Here, trial counsel called only appellant's brother during the punishment phase
to testify on appellant's behalf. While this may appear to be a failure to uncover and
present mitigating evidence, we simply have no facts in the record regarding trial
counsel's strategy at sentencing. It is possible that trial counsel determined that
psychiatric testimony would not be favorable to appellant. Accordingly, we hold that
appellant has not satisfied the first prong of Strickland. See Strickland, 466 U.S. at
687, 104 S. Ct. at 2064.

 We overrule appellant's fifth issue.

Conclusion

 We affirm the judgment of the trial court.

 

 Terry Jennings 

 Justice


Panel consists of Justices Jennings, Higley, and Sharp.


Do not publish. Tex. R. App. P. 47.2(b).

1. See Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003).
2. Although the Legislature has amended sections 9.31 and 9.32 of the Penal Code, the
offense for which the jury convicted appellant occurred in September 2006, which
was before the effective date of the amendments. Accordingly, our analysis of
appellant's issues is governed by the previous version of the statutes. Act of June 19,
1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3598 (amended
2007); Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141,
2141 (amended 2007).