**Affirmed and Opinion Filed July 27, 2018**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-00428-CR

**MELINDA LYNN MUNIZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-80836-2014**

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Whitehill

A jury convicted appellant of capital murder for causing the death of her fiancée's two-year-old daughter, Grace Ford, by suffocation. Appellant received an automatic sentence of life imprisonment without parole.

In six issues, appellant argues that (i) the evidence is insufficient to support her conviction; (ii) the trial court abused its discretion by admitting certain photographic and video evidence; (iii) the trial court erroneously refused a jury instruction on the lesser-included offense of felony murder; and (iv) the trial court erred by denying appellant's request to dismiss a juror based on a comment made by the juror's wife. For the reasons discussed below, we affirm the trial court's judgment.

## I.  BACKGROUND

Grace was nearly three years old when she was found unconscious and unresponsive, with duct tape over her mouth, in a locked apartment where appellant was the only one present. Although appellant staged an attack by an unknown intruder and initially claimed that she had been sexually assaulted, she later recounted her story and claimed that Grace put the duct tape on herself and her death had been an accident. A jury convicted appellant of capital murder and she received a mandatory life sentence without parole.

## II.  ANALYSIS

### A.    Is the evidence sufficient to support the conviction?

Appellant's sixth issue argues that the evidence is insufficient to support her conviction and a rational jury could not have found her guilty of capital murder. We disagree.

We review the sufficiency of the evidence to support a conviction by viewing all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

This standard gives full play to the fact finder's responsibility to resolve testimonial conflicts, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id*. at 319; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). And the fact finder is the sole judge of the evidence's weight and credibility. *See* TEX. CODE CRIM. PROC. art. 38.04; *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder's. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence

when viewed in the light most favorable to the verdict. *Murray*, 457 S.W.3d at 448. We must presume that the factfinder resolved any conflicting inferences in the verdict's favor and defer to that resolution. *Id.* at 448–49. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

Here, the State had the burden to prove that appellant intentionally or knowingly caused Grace's death, and that Grace was an individual under ten years of age. *See* TEX. PENAL CODE ANN. § 19.03 (a)(8).

The evidence at trial showed that appellant lived with, was engaged to, and was financially supported by Grace's father, Mitch Ford. Appellant took care of Grace.

The night before Grace was killed, Ford found topless photos and sexually suggestive videos appellant sent to her trainer on her phone, as well as "inappropriate" texts her trainer sent to her. The next morning, Ford broke off the engagement and gave appellant a week to find a job and a place to live.

Ford left for work shortly before noon. While at work, he made several attempts to reach appellant on her cell phone to firm up her move out date so he would know when to start Grace in day care. Appellant did not respond.

At 1:36 p.m., appellant called Ford and acted like she had just returned home with Grace. She then dropped the phone and made screaming noises. Ford called 9-1-1 and drove to his apartment, where officers had already arrived. Ford unlocked the door and the officers went inside.

Officers Arredondo and Waddell cleared the apartment. The officers found furniture in disarray, and appellant lying on the floor. Her pants and underwear were pulled down and there was duct tape over her mouth. Officer Waddell approached her and removed the tape from her mouth. Officer Camille Bowie stayed with appellant and tried to communicate with her.

–3–

Officer Bowie asked appellant to sit up. Appellant sat up on her knees, took a big breath, and gently fell to the floor "as if she had fainted." Appellant's eyes were fluttering as though she was trying to keep them shut. Based on her eyes and the way appellant fell to the floor, Officer Bowie did not believe she had really fainted. Appellant moaned and sighed while she was on the floor.

Appellant told Officer Bowie that she had gone to the jeweler to get some rings resized but realized on her way there that she did not have the rings. So she returned to the apartment, and she and Grace went inside. After she shut the door and locked it, a white male intruder with dark hair, black gloves, and black boots entered the apartment while she was on the phone with Ford. Appellant said the intruder hit her several times, pushed her, forced her to the ground, and sexually assaulted her. She continued to moan and sigh while she recounted her story, but Officer Bowie never saw any tears. Officer Bowie did not think appellant's behavior was consistent with someone who was a "legitimate victim" because there was no emotion on her face. Also, appellant's story about the door being locked was inconsistent with earlier statements because the police did not find an intruder in the apartment when they entered.

The police had three recorded conversations with appellant that day. The first was at the apartment and en route to the hospital. The second was before appellant's SANE exam, and the third was at the police station. In each conversation, appellant maintained that she had been attacked by an intruder and sexually assaulted. During the two hour interview at the police station, appellant told Detective Busby that she had amnesia and could not take a polygraph exam. Detective Busby said that appellant's timeline of events did not make sense because he did not think someone could sexually assault both Grace and appellant in a six to seven minute time span.

Officer Waddell did not think appellant's response was normal. Her version of events did not make sense to him because the door was locked and the suspect was gone. Although appellant

–4–

said she had been punched in the face multiple times with a closed fist, there was no swelling or obvious marks. Although she had a little redness to her cheeks, it was not consistent with someone being punched to the point of unconsciousness.

The officers canvased the apartments to find out if anyone had seen or heard anything. One resident from the apartment below, Jennifer Meir testified that she heard some thuds in the apartment above at about ten minutes after one, and it sounded like something hitting the floor.

The officers found Grace in her room, face down on her pillow, naked from the waist down. Grace's underwear was near the front door. She had duct tape from one cheek to the other but it did not cover her nose. The tape looked like it had been cut with scissors because the ends had straight edges, and Officer Arredondo described it as being firmly over Grace's mouth. Grace had no pulse and was unresponsive. Her lips were a blue-purple color and her eyelids were changing color. Officers began CPR, but she never regained consciousness.

Chis Raney, a paramedic, responded to the call to the apartment. Raney and his partner initially had trouble getting in because they did not have a gate code, but an officer let them in. The officers' CPR on Grace was in progress when they reached the apartment, and Raney took over. They also administered epinephrine, but Grace's heart did not resume beating. He continued to work on Grace on the way to the hospital, but she remained unresponsive.

Dr. Richard Honaker, an emergency physician, was on duty at the hospital when the paramedics brought her in. Grace was pale, not breathing, and her pupils were dilated. The doctors continued working on her and were able to get her heart to resume beating. When Dr. Honaker was preparing to put a Foley catheter in, he noticed some tears to her labia, bruising to the hymen, and some blood in that area. As a result, Dr. Honaker decided to have Grace transported to Children's hospital because it has sexual assault evidence collection processes in place.

Before Grace was transported to Children's Medical Center, the hospital performed a CAT scan. The scan showed that there was no bleeding in her head, but there was significant edema (swelling) in her brain. Grace was on a ventilator, and the doctors also noticed a V-shaped abrasion on her back.

Dr. Kristen Reeder, the attending physician at Children's Medical Center, described the V-shaped abrasion on Grace's back as a "pattern bruise." The bruise's location was strange because it was in a place not easily accessed by the child, and the fact that it was patterned led Dr. Reeder to believe that it was not made in the normal course of play or by accident. Dr. Reeder testified that Grace had severe hypoxic brain injury which was caused by a lack of oxygen to the brain. Grace was in the hospital for three days, but was eventually taken off of life support.

According to Dr. Reeder, a healthy child would not likely suffocate from tape being placed over her mouth because by the age of two or three, children can usually breathe through both their nose and mouth. Although a child could hypothetically die from tape blocking the child's mouth if the child had a stuffy nose, it would take much longer than three to five minutes. Moreover, a two to three year old would have the developmental ability to remove duct tape from her face if she did not want it there.

Dr. Reeder also conducted a sexual assault exam on Grace, but her findings were not conclusive for abuse.

The medical examiner determined that Grace died as a result of homicidal violence including suffocation. Her brain was severely swollen due to the lack of oxygen and there were no outward signs of strangulation such as ligature marks or petechiae (red dots).

The police found two articles of interest during a forensic investigation of the computers in Ford's apartment. One article was about a man who had killed his three children to get back at his ex-wife and then claimed insanity. Another article was about a teacher who had posted a

picture of her students with duct tape over their mouths with the caption "finally found a way to get them to be quiet."

The crime scene investigator recovered a pair of child's panties and pieces of duct tape from the apartment. A roll of duct tape was also found in the cabinet above the stove in the kitchen, and a pair of scissors was in a kitchen drawer. Other items retrieved included a pair of gloves in a Nordstrom's bag and zip ties in Grace's bedding and under the couch in the living room. Grace and appellant could not be excluded as possible contributors of DNA found on the zip tie in the bedroom.

The police also learned that on the day Grace was killed, appellant had purchased duct tape, zip ties, kitchen shears, and cotton swabs from a nearby Dollar Tree. The security footage showing appellant entering the store with Grace, placing her in the cart, and checking out was introduced into evidence and played for the jury.

Appellant was arrested twenty-one days after Grace was killed. In her final recorded interview with the police, she admitted that there had never been an intruder and she had not been raped. She claimed that she had gotten some materials that day so that Grace could do crafts, and had cut up pieces of tape for her. While she was cleaning the kitchen, Grace was playing with stickers and zip ties. Appellant said that Ford would never forgive her and "I did the wrong thing. I know I did the wrong thing. I could have helped her or something."

Appellant said that she came around the corner and saw Grace lying there face down on the bed in her room. According to appellant, Grace had put the tape on her own mouth. The detective told appellant several times that he did not believe that Grace put the tape on herself, and appellant must have done it, and asked if she tied Grace up with zip ties. Appellant admitted that she also thought Grace would have tried to remove the tape and this was the reason she was confused, except she had seen broken zip ties on the bedroom floor.

Appellant said she did not put the tape on Grace, but "when I went to grab it off, I freaked out and that's when I had my gloves, I got my gloves, and tried to do whatever." She said she put the tape back on Grace's face when she knew Grace "wasn't okay." Appellant claimed she panicked and decided to cover up because she could not tell anyone what really occurred.

Appellant said she began throwing materials away right away. Grace was unconscious when she left the apartment to throw away the duct tape and the scissors. Grace was still unconscious when she returned—she knew because she checked. When the detective asked if she thought Grace was dead at that point, appellant responded, "I don't know what I thought."

The detective asked appellant if she had partially or entirely removed the tape from Grace's mouth, but she could not remember. When asked if she had attempted CPR, appellant said she had pushed Grace's shoulders when Grace was lying on her stomach. Appellant added that she didn't know what to do for little kids.

The detective let appellant write a letter to Ford. In that letter she said that it was an accident and there was only so much she could do, and she should have tried harder to save [Grace].

Appellant called her mother from the jail after her final interview and told her she "kind of" confessed, but that what happened to Grace had been an accident. Appellant said Grace was on the bed, with duct tape on her mouth, and not breathing when appellant checked on her. She told her mother she tried to make it look like something else happened because she did not think anyone would believe it was an accident. Appellant's mother replied, "I don't know if a jury's ever going to believe that . . . Because, you know, if somebody can't breathe, they're going to try to pull it off . . . ." When her mother told appellant she could face the death penalty, appellant replied, "Can't they just say that I was, I don't know, mentally ill or something?"

Although appellant claims that Grace's death was accidental, there is sufficient evidence for a rational jury to conclude that appellant's conscious objective was to cause Grace's death, or

that she was aware that her conduct was reasonably certain to cause Grace's death. Proof of mental state will almost always depend on circumstantial evidence. *Lincoln v. State*, 307 S.W.3d 921, 924 (Tex. App.—Dallas 2010, no pet.).

Here, appellant purchased duct tape and scissors shortly before Grace suffocated and was found with duct tape over her mouth. Appellant's fiancée has just broken up with her and told her to move out, and there were articles about duct tape and revenge killing on one of the computers in the apartment. Appellant staged a cover up, claimed to have amnesia, and lied to the police. These attempts to conceal evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are circumstances of guilt. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd).

In addition, appellant was the only other person in the locked apartment when Grace died. The bruise on Grace's back likely had no accidental origin, and suggested that Grace was held down as she was suffocated. The evidence also established that a child Grace's age was capable of breathing through both her nose and mouth, and would have the ability to remove the tape if she could not breathe. And although appellant said that she removed the tape from Grace's mouth and then put it back, Officer Arredondo testified that the tape was firmly over Grace's mouth.

Viewing the evidence in a light most favorable to the jury's verdict, we conclude the evidence is sufficient to support appellant's conviction for capital murder. We resolve appellant's sixth issue against her.

## B. Did the trial court erroneously admit evidence?

Appellant's second, third, and fourth issues complain that the trial court erroneously admitted evidence over her rule 403 objection. *See* TEX. R. EVID. 403. Specifically, appellant challenges the admission of a photograph of Grace in the hospital (exhibit 140), two autopsy photographs (exhibits 150 and 153), and a video clip (exhibit 29).

–9–

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). A trial court's ruling will not be reversed unless it falls outside the zone of reasonable disagreement. *Id.*

Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[1]

A Rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and, (4) the proponent's need for the evidence. *Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005).

In deciding whether photographs are unfairly prejudicial, we consider: (i) the number of photographs, (ii) the size, (iii) whether they are in color or black and white, (iv) whether they are gruesome, (v) whether any bodies are clothes or naked, and (vi) whether a body has been altered by an autopsy. *Id.* at 734. If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the emotional aspects. *Erazo v. State*, 144 S.W.3d 487, 491–92 (Tex. Crim. App. 2004).

### 1. Exhibit 140

Exhibit 140 is a picture of Grace at the hospital showing her face, with her eyes closed, ribbons in her hair, and tape holding a breathing tube at her lips.

Dr. Reeder testified that Grace had been deprived of oxygen and suffocated. He explained that with suffocation, as opposed to strangulation, there would not be any ligature marks or

---

[1] This case was tried before the 2015 revisions to the Texas Rules of Evidence went into effect. We therefore refer to the version of the Rule applicable at trial.

petechiae, and a color change to a two-year-old's eyelids was a sign of suffocation or lack of oxygen to the brain. Officer Arredondo testified that when he found Grace in the bedroom, her eyelids and lips were turning blue-purple.

Exhibit 140 is an 8.5 x11 black and white, and Grace is wearing a shirt. This is the only photograph of Grace showing a close-up of her eyelids as they appeared when she was in the hospital, and it is not unduly gruesome. The picture is probative of the cause of death, and it allowed the jury to see Grace's physical condition as described in the testimony. Under these circumstances, we cannot conclude the trial court's decision to admit the photo was outside the zone of reasonable disagreement.

### 2. Exhibits 150 and 153

Exhibits 150 and 153 are autopsy photographs. Exhibit 150 shows Grace's face and the top of her torso. Her eyes are closed and there is an identification placard with a medical examiner's number on her chest. That placard partially covers a sewn-up autopsy incision that starts below her chin.

Exhibit 153 is a photo of Grace's back from just below her bottom to the hair gathered on top of her head. She is lying on her stomach with her face turned towards the sheet. There are dark marks on her right wrist and the "V" mark can be seen faintly on her back.

These two exhibits were among three autopsy photos that were admitted into evidence. They are the same size as the other picture and appear in our record in black and white. Although Grace is not clothed, the only private area visible is her buttocks.

Exhibit 150 identifies Grace, and both pictures tie the medical examiner's findings to her. In addition, Dr. Reeder referred to exhibit 150 in her testimony to help demonstrate the absence of petechiae and color changes to Grace's lips and eyelids, which were indicative of oxygen

deprivation. While exhibit 150 does show an incision made for medical purposes, it is mostly obscured by the placard, and is not redundant of any other photograph.

Exhibit 153 shows the V-shaped abrasion on Grace's back that Dr. Reeder described as a "pattern bruise." According to Dr. Reeder, the shape and location of this injury was unusual because the area is not easily accessible and would seldom be a location for accidental injuries or injuries during play. Detective Busby demonstrated how she believed the V-shape occurred either by appellant holding Grace face down on the pillow with the scissors in her hand, or by pushing Grace down on the bed with the scissors under her.

Appellant argues that the pictures were "unfairly prejudicial" and were meant to appeal to emotion rather than the fact finding process." The standard, however, is whether there is an "undue tendency" to suggest a decision on an "improper basis" such as an "emotional one." *See Newbury v. State*, 135 S.W.3d 22, 43 (Tex. Crim. App. 2004). The photographs here depict injuries that appellant allegedly caused and relate to the testimony describing those injuries. *See id.* Therefore, the trial court did not abuse its discretion by determining that any tendency of the pictures to suggest a decision on an emotional basis was not "undue" or that any "undue tendency" to suggest a decision on an emotional basis did not "substantially outweigh" the probative value of the pictures. *See id.*

### 3.    Exhibit 29

Exhibit 29 is a video clip less than a minute long showing Grace in her pajamas with her back to the camera ripping open the paper on a large Christmas present. Appellant contends the exhibit was "overly prejudicial."

In her final police interview, appellant claimed that Grace put the tape on her own mouth and had not removed it even though she could not breathe. The video demonstrates, however, that Grace was able to use both hands to tear away the wrapping paper, and continued her effort to

remove the paper despite the end of the package being taped closed. Dr. Reeder testified that a two to three year old would have the developmental ability to remove duct tape from her face if she did not want it there. The video is probative of this ability. Because Grace's ability to do so was at issue, we cannot conclude the admission of the video was an abuse of discretion.

We resolve appellant's second, third, and fourth issues against her.

## C. Was it error to deny appellant's request to dismiss a juror?

Appellant's first issue argues the trial court erred by refusing to dismiss juror number two after the parties discovered that his wife made a comment to him about the case.[2] We disagree.

When a juror converses with an unauthorized person about the case, "injury to the accused is presumed" and a new trial may be warranted. *Quinn v. State*, 958 S.W.2d 395, 402 (Tex. Crim. App. 1997); *see also* TEX. CODE CRIM. PROC. art. 36.22. But the State may rebut this presumption of harm with testimony from the juror involved in the improper conversation. *Id.* In determining whether the State rebutted the presumption of harm, appellate courts view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of the historical facts and its determinations concerning credibility and demeanor. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

Here, five days into trial, counsel for the State was notified that a female juror (juror number seven) had received outside information about the case from her hair stylist. As a result, the court questioned each juror individually. Juror number seven was vague and inconsistent about whether she had received any outside information about the case, and the judge described her

---

[2] Appellant argues that she was denied a constitutional right to a fair trial. To the extent that she is arguing that she should have been granted a mistrial or was denied due process, those objections were not made in the trial court and thus have not been preserved for our review. *See* TEX. R. APP. P. 33.1.

demeanor as like "the kid whose hand got caught in the cookie jar." Therefore, the parties agreed to replace juror number seven with an alternate.

During questioning of the remaining jurors, juror number two said that his wife asked him to tell her about the case, but he told her it was not a good idea. When his wife persisted, the juror repeated that he was not going to discuss the matter. His wife suggested that he was angry, which the juror denied, but he reiterated that he wanted no further discussion. His wife replied, "Juice her."

Juror number two indicated that his wife's comment would not impact his personal decision and he could fairly and impartially evaluate the evidence. The court asked him if he could reach a verdict that might irritate his wife, and the juror replied, "Of course. She's not impacting my thought process or my decision-making process at all." When the court asked if he would base his decision on the facts and the law, the juror replied, "Yes."

Defense counsel argued that the juror should be removed, but the trial court stated that the juror had been forthright, "quite candidly" said he could return an impartial verdict because "it's his verdict, not hers." The court further noted that while "juice her" is a powerful statement, "the death penalty is not on the table." Because the judge found that the juror's frustration with his wife was "quite clear in his intonation," he denied the request to dismiss the juror.

The record does not conclusively establish that the juror's wife's comments constituted a statutorily proscribed conversation about the case. *See, e.g., Palasota v. State*, 460 S.W.3d 137, 141 (Tex. Crim. App. 1970) (unresponded to statements made by outsiders do not constitute a conversation about the case within the meaning of the statute). But assuming without deciding that the comments constituted a prohibited conversation, we conclude that the evidence supports a finding that the conversation was harmless.

–14–

The judge here found that the juror's testimony was credible, his tone and demeanor sincere, and he believed the juror's assurances that he could be fair and impartial. Moreover, when questioned, none of the other jurors indicated that juror number two had disclosed the conversation to them. And the judge admonished the juror not to discuss the conversation with his wife or his conversation with the judge with anyone else on the jury. Under these circumstances, we cannot conclude that the trial court's determination caused harm. We resolve appellant's first issue against her.

**D.    Did the trial court erroneously refuse a lesser-included instruction on felony murder?**

Appellant's fifth issue argues that the trial court erred by refusing her request for an instruction on a lesser-included offense—felony murder.

To determine whether a jury should be charged on a lesser offense than the one for which a defendant is indicted, courts apply a two-prong test: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged; and (2) some evidence must exist that would allow a rational jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1992).

The first step is a question of law in which we compare the elements alleged in the indictment with the elements of the lesser offense to determine "if the proof necessary to establish the charged offense also includes the lesser offense." *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012); *see also* TEX. CODE CRIM. PROC. ANN. 37.09. The second step requires us to determine if there is some evidence in the record that would allow a rational jury to find that, if the appellant is guilty, she is guilty only of the lesser offense. A defendant is entitled to an instruction on a lesser-included offense "if some evidence from any source raises a fact issue on whether she is guilty only of the lesser [offense], regardless of whether the evidence is weak, impeached, or contradicted." *Cavazo*s, 382 S.W.3d at 383. Thus, in making this determination,

–15–

we must review all evidence admitted at trial. *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000).

In certain circumstances, felony murder can be a lesser-included offense of capital murder. *See Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004). Felony murder occurs when an individual commits felony, other than manslaughter, and in the course of and in furtherance of that felony, commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02. In other words, felony murder is essentially an unintentional murder committed in the course of committing a felony. *Lewis v. State*, No. AP-77,045, 2017 WL 1493498, at *12 (Tex. Crim. App. 2017) (mem. op.).

Here, although appellant failed to specify the predicate felony, giving her every benefit of the doubt, we assume from the context of her argument that she relies on injury to a child as the underlying offense for felony murder. Injury to a child involves intentionally, knowingly, recklessly, or with criminal negligence causing serious bodily injury or bodily injury to a child. TEX. PENAL CODE § 22.04(a). Injury to a child can be the predicate offense for felony murder. *Contreras v. State*, 312 S.W.3d 566, 584 (Tex. Crim. App. 2010).

The State does not dispute the first prong of the lesser-included offense test. Therefore, we consider only the second prong—whether there is some evidence in the record that would allow a rational jury to find that, if appellant is guilty, she is guilty only of the lesser offense. *Cavazos*, 382 S.W.3d at 383.

Appellant relies on her admission to the police that she put the tape back on Grace's mouth and pushed her down in the process of administering CPR. At trial, appellant's counsel argued, "In the process, the child at some point did die."

There is no evidence that Grace died while appellant was attempting CPR. While appellant admitted that she put the tape back on Grace's mouth, she never indicated that Grace was

still conscious or breathing when this occurred. Instead, it happened at a time when appellant said that Grace "wasn't o.k." And there is no other evidence in the record to support the felony murder theory counsel advanced at trial.

Moreover, appellant's version of events was that Grace's suffocation was self-inflicted and was not caused by any of her own conduct. A defendant's account that she committed no offense, or testimony that shows no offense occurred, is not adequate to support a lesser-included offense instruction. *See Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001). Therefore, appellant's statement to the police does not advance submitting the lesser-included injury to a child offense because, if believed, it would show that appellant is not guilty of any offense, including the lesser-included offense. *See Shaw v. State*, No. 03-99-00253-CR, 2000 WL 329256, at \*3 (Tex. App.—Austin Mar. 30, 2000, pet. ref'd) (mem. op.).

Because there was no evidence from any source showing that appellant could only be guilty of the lesser-included offense, the trial court did not err by refusing the instruction. We resolve appellant's fifth issue against her.

### III. CONCLUSION

Having resolved all of appellant's issues against her, we affirm the trial court's judgment.

/Bill Whitehill/
_____
BILL WHITEHILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.1
180428F.U05

–17–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MELINDA LYNN MUNIZ, Appellant

No. 05-18-00428-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 401st Judicial District Court, Collin County, Texas
Trial Court Cause No. 401-80836-2014.
Opinion delivered by Justice Whitehill.
Justices Francis and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 27, 2018.